**DON KING PRODUCTIONS, INC., Plaintiff,**

**v.**

**James "Buster" DOUGLAS, John P. Johnson, Golden Nugget, Inc., and the Mirage Casino–Hotel, Defendants.**

**No. 90 Civ. 1203 (RWS).**

United States District Court, S.D. New York.

May 18, 1990.

As Amended Aug. 29, 1990.

Sidley & Austin, P.C., New York City (Robert W. Hirth, of counsel), for plaintiff.

Stephen E. Kaufman, P.C., New York City (Stephen E. Kaufman, of counsel), Hunterton & Naylor, P.C., Las Vegas, Nev. (C. Stanley Hunterton, of counsel), for defendants James "Buster" Douglas and John P. Johnson.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City (Robert Fryd, of counsel), for defendants The Mirage Casino–Hotel and Golden Nugget, Inc.

## OPINION

SWEET, District Judge.

This action is brought by plaintiff Don King Productions, Inc. ("DKP") against defendants James "Buster" Douglas ("Douglas") and his manager John P. Johnson ("Johnson") for breach of contract, and against Golden Nugget, Inc. and The Mirage Casino–Hotel (collectively, "Mirage") for tortious interference with contract. The Mirage has asserted a counterclaim seeking a declaration that the contracts between DKP and Douglas are invalid. Before the court is DKP's motion pursuant to Rule 56, Fed.R.Civ.P., for summary judgment on the breach of contract count of its complaint; DKP's motion to dismiss the counterclaim of GNI pursuant to Rule 12(b)(1) for lack of standing; Douglas and Johnson's motion pursuant to Rule 56 for summary judgment dismissing the complaint; and Mirage's motion pursuant to Rule 56 for summary judgment dismissing the complaint. For the reasons stated below, the summary judgment motions of DKP, Mirage and Douglas and Johnson are denied. The motion of DKP to dismiss Mirage's counterclaim is granted.

### The Parties

The parties to this proceeding and their various causes are somewhat notorious within the confines of the sporting and gaming world. The unacquainted (those who need a program to tell the players) are referred to the prior opinion of this court dated April 4, 1990, which denied the motion of the defendants to dismiss the complaint on jurisdictional grounds (or alternatively, to transfer it to Nevada), except as against former plaintiff Trump Plaza Associates, whose companion complaint was dismissed for want of jurisdiction. 735 F.Supp. 522.

*Prior and Parallel Proceedings*

This breach of contract and tortious interference action by DKP against Johnson, Douglas and Mirage (the "New York action") was commenced in this district at 10:48 a.m., Eastern Standard Time, on February 22, 1990. The prior day, at 4:58 p.m., Pacific Standard Time, in the District Court of Clark County, Nevada, an action was filed by Douglas, Johnson and Mirage against DKP, requesting a declaratory judgment that Douglas and Johnson were not bound by their contracts with DKP and that Mirage had not tortiously interfered with those contracts.

By order to show cause of March 7, 1990, DKP sought in this forum a preliminary injunction order enjoining Douglas and Johnson from acting in any manner inconsistent with DKP's asserted contractual right exclusively to promote boxing bouts engaged in by Douglas. The show cause order also sought expedited discovery and the setting of an early trial date. At the order to show cause hearing of March 9, 1990, expedited discovery was granted, a discovery and motion schedule established, and a date of April 16, 1990 set down for a consolidated trial of the complaint and motion for preliminary injunction.

Pursuant to the approved schedule, Johnson, Douglas and the Mirage on March 13 filed motions to dismiss or transfer to Nevada the DKP complaint (and the Trump Plaza Associates complaint that had been subsequently filed), returnable on March 16, 1990. The motions were argued on that date, and decided in the noted April 4 Opinion granting the defendants' motion to dismiss the complaint of Trump Plaza Associates and denying their motion to dismiss or transfer the DKP action.

Meanwhile, the Nevada state court action was removed by DKP to the United States District Court, District of Nevada, on diver-

sity grounds, and assigned to the Honorable Howard D. McKibben. A remand motion followed. On or about March 19, 1990, the Nevada federal court denied the motion to remand the action to state court. The federal court also on that date established a discovery schedule, and set the matter for hearing on April 9, 1990, *i.e.,* one week in advance of the previously-assigned date for trial of the action set in the United States District Court for the Southern District of New York.[1]

The April 9 date set in the Nevada action proved to be premature for some or all of the parties. Accordingly, three or four days before that date a stipulation of the parties was entered in that action continuing the trial to April 23. Simultaneously, a stipulation was submitted in the New York action, and was "so ordered" on April 6, 1990, providing that the trial scheduled to take place on April 16 in New York would be continued to a date convenient to the court and after April 30, 1990.[2]

As it turned out, the rescheduled April 23 date for trial of the Nevada action also proved untenable. Three days after the parties' stipulation to that date, on April 9, 1990, on the Nevada court's own motion, an order was entered vacating the trial setting that had three days before been "trailed" to April 23. The order continued the Nevada trial date another month, to May 21, 1990.

Further jockeying back and forth by the parties over the trial dates ensued. DKP sought a conference before this court for the asserted purpose of fixing a firm, prompt date for the consolidated trial on the preliminary injunction motion (which had been brought on by order to show cause on March 7) and on the complaint. At conference before this court on April 23, and consistent with the court's understanding of the parties' New York stipula-

---

1. At that hearing, the Nevada federal court indicated that if it found sufficient Nevada contacts and decided, *contra* to the then-pending transfer motion of DKP before it, that the case should remain in Nevada, then in all probability it would proceed to trial in Nevada first.

2. The stipulation governing the Nevada lawsuit, but not the New York action, stated that Johnson, Douglas and Mirage "are entering into this stipulation upon the condition that the trial of the New York Lawsuits presently set for April 16, 1990 shall be continued until a date after April 30, 1990, to preserve the priority of trial dates that presently exists."

tion (which provided for rescheduling of the adjourned April 16 New York trial to a convenient date "not before April 30, 1990"), the New York trial was set for May 1, 1990.

Following that conference but on the same day, counsel for Douglas and Johnson arranged an emergency telephone conference before the Nevada court during the course of which Judge McKibben indicated that he had not yet ruled on DKP's pending application to transfer the action to New York but was disinclined to grant the motion and in all probability would retain the case. The court further indicated that if it determined there had been a breach of the parties' Nevada stipulation, it would consider advancing the May 21 Nevada trial date to April 30, the day before the May 1 trial setting in New York.

Apprised by the parties of the Nevada court's predicted course of ruling on the transfer motion, this court held a conference on April 25 to again address the trial setting. For the purpose of providing all parties with a date certain for trial, and in view of indications that the urgency of DKP's request for prompt hearing of its preliminary injunction motion had abated, the trial setting in New York was adjourned to the date of the Nevada trial—May 21—the court further deferring to the Nevada court the determination of the geographic location of the trial to be held on that date.

Following that conference and in accordance with the briefing schedule previously agreed to in the New York action, the parties brought the instant motions, each returnable on April 27, 1990. The motions were orally argued on the return date, and taken under submission as of that date. An amicus curiae brief of Evander Holyfield was also permitted to be filed on that date.

*The Facts*

The following facts for purposes of these motions are undisputed. Douglas, a professional boxer, and Johnson, his manager, both citizens of Ohio, entered into a boxing promotion agreement dated December 31, 1988 (the "Promotional Agreement" or "Agreement"), with DKP, a New York corporation engaging in boxing promotions with its principal place of business in New York. Douglas was paid $25,000 by DKP as consideration for entering into the Promotional Agreement.

A. Negotiation of the Agreement

The Agreement was negotiated on behalf of Douglas by his manager Johnson and his attorney Stephen Enz, who had represented Douglas and Johnson in past contractual dealings with DKP.[3] The arms-length negotiations were conducted with King, and DKP's counsel, by correspondence between Ohio, New York and Nevada, and to some degree by telephone between Ohio (where Douglas, Johnson and Enz reside) and New York (where DKP's office and counsel are located) and between Ohio and California and Las Vegas, Nevada (locations at which King was also present during part of the period of the negotiations). No face-to-face negotiations took place. Instead, following initial correspondence back and forth, a draft agreement was drawn up by Enz, working from the prior promotional agreement DKP and Douglas had contracted, apparently was signed by Douglas and Johnson in Ohio, and was then sent to King. King made certain changes to the draft, and executed the Agreement, which was sent by his counsel in New York to Enz in Ohio.[4] Douglas and Johnson there executed the Agreement. Their counsel

---

**3.** Douglas fought his first fight for King in November 1984. Since then Douglas has made numerous contractual arrangements with DKP with respect to particular bouts. In 1986, Douglas entered into an exclusive promotional agreement with DKP, pursuant to which several bouts involving Douglas were promoted. Shortly prior to expiration of the 1986 promotional agreement, negotiations commenced with re-

spect to the Promotional Agreement that is the subject of this lawsuit.

**4.** King states in his affidavit that he executed the Agreement in New York. Johnson and Enz assert that King executed the Agreement in Nevada, but do not state they witnessed his signature nor state the basis for their personal knowledge of this fact.

thereafter sent one of the final copies to King in Las Vegas, where a fight he was promoting was about to take place.

## B. Terms of the Promotional Agreement

The Agreement provides DKP with the "sole and exclusive right to secure and arrange all professional boxing bouts" of Douglas for the term of the Agreement. DKP in turn obligates itself to promote not less than four bouts requiring Douglas' services during the annual period ending February 25, 1990, and, for two years' thereafter, no less than three bouts per year. Such bouts were to be on dates and at sites designated by DKP, and against opponents designated by DKP after consultation with Douglas and Johnson.

With respect to any bout, the contract deems DKP to have complied with its promotional obligations if it has made a "bona fide offer" to Douglas to promote a bout, "irrespective of whether such bout actually takes place for any reason other than DKP's nonperformance." Purses payable by DKP to Douglas for bouts undertaken pursuant to the Agreement are to be negotiated and mutually agreed upon by the parties, and are subject to a floor of $25,-000 and $10,000 in training expenses per bout. The Promotional Agreement contemplates that such bouts would be governed by individual bout agreements, the standard terms of which were affixed to the Promotional Agreement.

The Promotional Agreement also set forth the intention of DKP to promote a heavyweight championship bout involving Douglas, and provided that the three year term of the Agreement would be automatically extended in the event Douglas was recognized as world champion, "to cover the entire period you are world champion and a period of two years following" loss of the title. Under the Agreement Douglas promised to "not participate in any bouts other than bouts promoted or co-promoted by DKP" nor "render ... services as a professional boxer" to any entity other than DKP. Douglas also represented that he would not enter into any oral or written contract that "conflict[ed] in any material respect with the provisions" of the Agreement, that "purport[ed] to grant similar or conflicting rights" to any person other than DKP or that "might interfere with [Douglas'] full and complete performance" of the Agreement.

The Agreement authorized DKP to promote other professional boxers, including those in the same weight class as Douglas. The Agreement also contained a choice of law provision providing that it would "in all respects be governed, construed and enforced in accordance with the laws of the State of New York applicable to contracts to be fully performed therein."

## C. Performance under the Promotional Agreement

Pursuant to the Promotional Agreement, Douglas participated in three bouts arranged by DKP during the first year ending February 25, 1990. The last of these was the heavyweight championship bout held on February 10, 1990, in Tokyo, Japan between Douglas and the then-heavyweight champion, Michael Tyson. In accordance with the Promotional Agreement, which called for the monetary terms of each bout to be negotiated and set forth in a separate agreement, Douglas and Johnson entered into a bout agreement for that fight, dated August 14, 1989 (the "Bout Agreement"), pursuant to which Douglas was to be paid $1.3 million, inclusive of training expenses.[5] Douglas won the bout and became the undisputed heavyweight champion of the world.

The other two fights promoted by DKP pursuant to the Promotion Agreement that contract year were against Trevor Berbick

---

**5.** The Bout Agreement was negotiated in Ohio between King and Johnson and executed by Johnson and Douglas in Ohio and by King in New York. One of the terms of the Bout Agreement granted DKP an "exclusive option" to promote [Douglas'] next three bouts following the Tokyo bout, such option to be exercised by giving notice to Douglas no later than 30 days after the Tokyo bout. The contract provided that Douglas would receive $1 million for each of such subsequent bouts, except that in the event Douglas was the winner of the Tokyo bout, subsequent bouts would be subject to negotiation of a higher purse.

(on February 25, 1989 in Las Vegas, Nevada), and Oliver McCall (in July 1989 at Atlantic City, New Jersey). A fourth bout, which was to take place in Edmonton, Alberta on November 18, 1989 between Douglas and fighter Ken Lukasta, as part of the "undercard" preceding a title bout between Tyson and Donovan ("Razor") Ruddock, was cancelled due to the illness of Tyson, which resulted in the cancellation of the entire event. Bout agreements had been signed prior to the cancellation by Douglas and Lukasta. DKP paid Douglas $10,000 in training expenses for the bout.

### D. *Events In Tokyo*

During the February 10 Tokyo bout against Tyson, Douglas was knocked down during the eighth round but came to his feet prior to the referee's conclusion of the count. Douglas went on to knock out Tyson in the tenth round. King, who also is Tyson's promoter, protested at the end of the eighth round, to boxing officials who were ringside, that the referee's count had been too long. After the fight, a press conference was held at which the "long count" theory was further aired, and later, formal challenges to the fight decision were filed by the Japanese Boxing Commission and by Tyson with certain boxing governing bodies, apparently predicated on the "long count" theory. The result was to place in temporary doubt official recognition of Douglas' victory over Tyson.

### E. *Post–Tokyo Negotiations and the Douglas–Mirage Contract*

On or about February 14, 1990, Johnson met with King in New York to discuss terms for a Douglas rematch with Tyson which King sought to hold in June 1990 at Trump Plaza in Atlantic City, New Jersey. Around the same time, a representative of Mirage contacted Johnson and expressed an interest in having Douglas' next fight at the Mirage Hotel in Las Vegas. After further phone conversations with Johnson and Douglas' lawyer, and a visit by a Mirage emissary to Ohio, on February 18, 1990, Mirage sent its president and corporate jet to Columbus, Ohio to pick up Douglas and Johnson and bring them to the hotel to stay as guests of the Mirage, where discussions were planned concerning holding Douglas' next fight at the hotel.

Prior to the February 18 plane ride, DKP had become aware of Mirage's interest in Douglas. On February 16, 1990, DKP had its lawyers notify Mirage by letter of DKP's contractual rights to Douglas' boxing services. Mirage thereafter obtained and reviewed a copy of the Promotional Agreement.

After returning to Las Vegas, Mirage officials met with Johnson and Douglas over the next two to three days, and with numerous lawyers and promoters, discussing possible terms and arrangements for a boxing contract involving Douglas' services. King flew out to the Mirage on February 20 in an effort to come to terms with Johnson or reach some understanding with Mirage. His efforts apparently failed and on February 21, 1990, Douglas and Johnson executed a contract with Mirage (the "Mirage–Douglas Contract").

The Mirage–Douglas Contract provides for Douglas to fight two bouts at the Mirage, in consideration for which he is to receive a minimum payment of $25 million for performing in the first bout and another $25 million for a second heavyweight championship bout to be performed pursuant to its terms. The Contract also contains an express condition precedent, which makes Mirage's rights and obligations under the Contract contingent upon the parties' first obtaining, by September 1, 1990, a release from DKP of its purported exclusive rights or a judicial declaration that the exclusive promotional rights of the Promotion Agreement and Bout Agreement are void and unenforceable. The parties to the Contract filed a suit on the date of its execution in Nevada state court, seeking such a declaration, which action is now before the federal district court in Nevada.

### I. *The Breach of Contract Motions*

Both the motion of DKP for summary judgment on its breach of contract claim and the motion of Johnson and Douglas for summary judgment dismissing that claim place in issue the validity of the Promotion-

al Agreement and the Bout Agreement. Johnson and Douglas argue, *inter alia,* that the agreements are invalid under Nevada law because a regulation of the Nevada Athletic Commission forbids exclusive boxing contracts. They urge further that a Nevada state court has preclusively determined that Nevada law, including that boxing regulation, governs the contract issues in this lawsuit. The parties agree that neither the boxing laws of New York, *see* New York Unconsolidated Laws § 8906, nor New York's law of contractual obligations, *see, e.g., Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917); *King Records, Inc. v. Brown,* 21 A.D.2d 593, 252 N.Y.S.2d 988 (1st Dep't 1964), proscribe promotional agreements with exclusive representation terms. As the parties differ over whether Nevada or New York law should govern the determination of contract issues, analysis begins with a discussion of the Nevada state court ruling that is alleged to preclude litigation of that very question of applicable choice of law.

*Preclusion of DKP's Litigation of Choice-of-Law and Contract Validity Issues Underlying the Breach of Contract Claim*

In *Top Rank, Inc. and Matthew Hilton v. Don King Productions, Inc. and Don King,* No. A266756 (Clark County, Nevada July 27, 1988) (the *"Hilton action"*), the Honorable J. Charles Thompson, a Nevada state court district judge, entered a preliminary injunction restraining DKP from interfering with the staging or televising of a boxing contest to be held two days' later in Las Vegas involving a fighter, Matthew Hilton, who was at that time under an exclusive contract to DKP. The court found that the promotional agreement and bout agreement between Hilton and DKP were prohibited by Regulation 467.112, Rules and Regulations of the Nevada Athletic Commission ("N.A.C."), in that each agreement provided that Hilton "must fight exclusively for one promoter or at his

option." Finding No. 1. The court further concluded that the agreements "are void and unenforceable in the State of Nevada." Finding No. 3.

On the basis of this ruling, Johnson and Douglas urge, by virtue of offensive collateral estoppel, that DKP is precluded from litigating in this court (1) whether New York, as opposed to Nevada, law governs the validity and enforceability of the Promotional and Bout Agreements and (2) whether N.A.C. § 467.112 renders the Promotional and Bout Agreements void and unenforceable.

■ In determining the issue-preclusive effect of the Nevada state court's judgment in the *Hilton* action, this "federal court must give to [the] state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered," *i.e.,* Nevada. *Migra v. Warren City School Dist. Bd. of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 42 n. 3 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *Brennan v. EMDE Medical Research, Inc.,* 652 F.Supp. 255, 266 (D.Nev.1986) (citing *Hirst v. State of California,* 770 F.2d 776 (9th Cir.1985)). Nevada law, like that followed in New York and this federal court, requires that for preclusive effect to be given with respect to a particular issue, (a) the party against whom preclusion is asserted be a party fully represented in the prior adjudication; (b) the issue decided in the prior adjudication be identical to that presented in the action in question; (c) final judgment on the merits have been entered in the prior adjudication; and (d) the issue have been actually litigated in, and were necessary and material to, the prior adjudication.[6]

For several reasons, the *Hilton* action does not have the preclusive effect urged.

---

**6.** *See Marine Midland Bank v. Monroe,* 756 P.2d 1193, 1194 (Nev.1988); *Paradise Palms Community Ass'n v. Paradise Homes,* 89 Nev. 27, 505 P.2d 596, *cert. denied,* 414 U.S. 865, 94 S.Ct. 129, 38 L.Ed.2d 117 (1973); *Markoff v. New York*

*Life Ins. Co.,* 92 Nev. 268, 549 P.2d 330, 332 (1976); *Lucas v. Page,* 91 Nev. 493, 538 P.2d 165, 166 (1975); *Brennan v. EMDE Medical Research, Inc.,* 652 F.Supp. 255, 266 (D.Nev.1986) (Nevada law of issue preclusion); *Kamakazi*

First, the *Hilton* court's determination of the applicability of Nevada law to the Hilton contracts could not be preclusive upon the choice of law governing the Promotional and Bout Agreements here in question because the issue decided there and that subject to determination in this lawsuit, if assumed to share legal identity, nevertheless are not factually identical.[7]

## A. *Identity of Factual Predicates*

■ As further evinced in the choice-of-law portion of this opinion, *infra*, determinations of governing law are fact-based, resting, *inter alia*, upon discrete findings with respect to such matters as the contractual parties' citizenship, residence, place of contract negotiation, place of contract execution, contract subject matter, and contemplated or actual place of performance under an agreement. In a particular case, distinct choice-of-law approaches no doubt provide differing assessments of the relevance of such contacts (and perhaps suggest the relevance of additional contacts), and there are a myriad of such choice-of-law approaches theoretically

*Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 69, 80 (S.D.N.Y.1982) (federal rules of collateral estoppel); *Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 486, 414 N.Y.S.2d 308, 311, 386 N.E.2d 1328, 1331 (1979), *cited in Commonwealth Ins. Co. v. Thomas A. Greene & Co.*, 709 F.Supp. 86, 88 (S.D.N.Y.1989). The parties have not suggested any respect in which Nevada decisional law of issue preclusion distinctively supports or disserves their contentions with respect to the particular intricacies of the doctrine of collateral estoppel that arise in this suit and have not shown any inclination in their briefs to regard as any less persuasive decisional law arising in other jurisdictions that is relevant to the preclusion issues to be decided here.

7. No decision has been cited by Douglas and Johnson in which the doctrine of collateral estoppel is employed to export choice-of-law determinations of one forum (presumably predicated on the rendering forum's choice-of-law rules) to another forum that would otherwise adhere to its own choice-of-law rules in making its selection of governing law. Nevertheless, for purposes of resolving the preclusion argument, the theoretic legitimacy of this peculiar form of collateral estoppel has been assumed proper here, and not overridden by the "different legal standard" (as opposed to distinct fact pattern) exception to issue preclusion, which denies preclusive effect to a sending forum's determination of an issue when, in the receiving forum, the identical facts would be governed by distinct legal criteria. *See, e.g., Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir.1971) (9th Cir.1971). Thus, no reliance has been placed upon decisions such as *Guild Trust v. Union Pacific Land Resources Corp.*, 682 F.2d 208, 211–212 (10th Cir.1982) or *Evanston Insurance Co. v. Affiliated FM Insurance Co.*, 556 F.Supp. 135, 137 (D.Conn.1983), to the extent they may stand for the proposition that the preclusive effect of a foreign court's prior determination of an otherwise identical legal issue may be avoided based upon a finding it was decided under the local law of the foreign forum rather than the local law of the home forum.

The reasoning of these decisions may be sound to the extent it is based upon an anterior finding that the choice-of-law rules the "home" court is bound to apply (say, by virtue of *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)) dictate the application of a different (and distinctly configured) local law than that applied by the foreign, sending jurisdiction (making the subsequently addressed, substantive issue truly not identical). Nevertheless, this view has not been relied upon as the basis for the preclusion determinations which follow in the text of the opinion, because such a view may not adequately account for the requirement that courts give full faith and credit to judgments rendered by a foreign jurisdiction.

Principles of comity, laws of Congress, *see* 28 U.S.C. § 1738, and Supreme Court decisions, *e.g., Migra v. Warren City School Dist.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984), indicate that full faith and credit means giving foreign judgments the same preclusive effect they would receive in the foreign jurisdiction. Certain decisional law suggests the appropriateness of making the home state's determination of the legal identicality of the issue for preclusion purposes (a question in theory to be judged under the foreign state's law of preclusion) depend upon ignoring home choice-of-law rules in favor of application of the choice-of-law rules of the foreign jurisdiction. *See O'Shea v. Chrysler Corp.*, 206 F.Supp. 601 (D.N.J.1962) (rejecting on full faith and credit grounds argument that collateral estoppel does not apply to prior adjudication of choice-of-law issue); *cf. Rouse Constr., Inc. v. Transamerica Ins. Co.*, 750 F.2d 1492 (11th Cir.1985) (evidentiary—as distinguished from preclusive—effect of Mississippi judgment upon diversity actions in Georgia must be measured by Georgia law, since choice-of-law rules of forum state control choice between Mississippi and Georgia law, not principles of full faith and credit). *See generally*, 18 Wright, Miller & Cooper, *Federal Practice and Procedure* §§ 4467–68, 4472 and Green, *The Inability of Offensive Collateral Estoppel to Fulfill Its Promise: An Examination of Estoppel in Asbestos Litigation*, 70 Iowa L.Rev. 141, 186 n. 259 (citing helpful sources).

available to guide the ultimate legal determination.[8] However, each depends in the first instance on a determination of the array of facts connecting the particular litigation to the competing governing laws (a determination necessary even to determine which fora are candidates for selection as source of governing law).[9]

■ Obviously, the *Hilton* court did not and could not have made findings as to the broad set of facts that connect the instant litigation between Douglas, Johnson and DKP to Nevada, Ohio and New York, respectively, since that collection of parties, contractual relations and possible law choices was not before it, was not necessary to its decision, and was not actually litigated. Yet collateral estoppel "makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision," *Yates v. United States*, 354 U.S. 298, 336–337, 77 S.Ct. 1064, 1085–1086, 1 L.Ed.2d 1356 (1957). The *Hilton* determination as to appropriateness of the application of Nevada law to that prior litigation therefore may not foreclose consideration of the distinct factual record of contacts presented by this litigation, nor the mixed question of fact and law that necessarily arises from it. However broad is the reach of issue preclusion, a given resolution of a question of application of law (or a mixed question of law and fact) may not serve to preclude litigation of the same overlying legal issue where the second determination properly requires taking cognizance of distinct, or changed, facts.[10] *See Steel v. United States*, 813 F.2d 1545, 1550 (9th Cir.1987) (California state court determination in 1977 as to jurisdiction over person in 1977 had no preclusive effect upon personal jurisdiction determination by federal court in action brought in 1985 because "issue preclusion ... is limited to cases where the legal and factual situations are identical."); *Smith v. Western Electric Co.*, 770 F.2d 520, 525 n. 5 (5th Cir.1985); *Milens v. Richmond Redevelopment Agency*, 665 F.2d 906, 908–09 (9th Cir.1982); *Hilkovsky v. United States*, 504 F.2d 1112, 1113–14, 205 Ct.Cl. 460 (1974). *See also Dracos v. Hellenic Lines, Ltd.*, 762 F.2d 348, 353 (4th Cir.1985) (en banc) ("If the facts upon which jurisdiction [and choice of law] [are] based are inherently subject to change, then a district court may be justified in giving the prior finding no preclusive effect.").

■ Even were that general proposition in doubt, the result it implies is necessarily compelled when the judicial fact-finder in the prior adjudication does not disclose the factual determinations it made that served as the predicate for its legal conclusion,

8. *E.g.*, Joseph Beale's "vested rights" approach contained in the original *Restatement of Conflict of Laws* (1934); Brainerd Currie's "governmental interest analysis," *see* B. Currie, Selected Essays on the Conflict of Laws (1963); comparative impairment analysis, *see* Baxter, *Choice of Law and the Federal System*, 16 Stan.L.Rev. 1 (1963); Robert Leflar's "choice-influencing considerations," including the "better law," R. Leflar, American Conflicts Law (4th ed. 1986); the "functional analyses" of von Mehren, *see Recent Trends in Choice-of-Law Methodology*, 60 Cornell L.Rev. 927 (1975); and the *Restatement (Second) of Conflict of Laws* grab-bag.

9. This factual connection is required as a matter of federal constitutional law, as well. Choice-of-law determinations must be factually predicated, since for a state's substantive law to be selected in a constitutionally permissible manner, that state must have a "significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction" ensuring that choice of its

law "is neither arbitrary nor fundamentally unfair." *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 308, 101 S.Ct. 633, 638, 66 L.Ed.2d 521 (1981). Of course, "a set of facts giving rise to a lawsuit, or a particular issue within a lawsuit, may justify, in constitutional terms, application of the law of more than one jurisdiction." *Id.* at 307, 101 S.Ct. at 637.

10. Here, of the parties in question, only DKP was before the *Hilton* court. If DKP's past connections to Nevada had been explored by the court, and had findings been made as to them, such findings of "historic fact" would likely preclude relitigation of those particular facts, *see* 18 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4416, at 146, § 4417 at 164 n. 35. No such findings were made, however. The remaining parties' connections to Nevada and other states, and their connections to the dispute, to DKP and the contracts, were not before the *Hilton* court and so could not have been the subject of factual findings there.

since without such an indication it cannot be known whether the subsequent litigation involves essentially the same facts as were before the fact-finder in the prior action, or "separable" ones requiring a different legal conclusion. In the *Hilton* action, the judge made no factual findings as to the basis for his implicit holding that Nevada law governed the dispute.[11] Whether the factual predicate the *Hilton* court relied upon at the time of its decision corresponded in all essential respects with that presented here therefore cannot be established with any certainty. *Cf. Brennan v. EMDE Medical Research, Inc.*, 652 F.Supp. 255, 266 (D.Nev.1986) (denying issue preclusive effect to state court judgment under Nevada law where "[f]rom the face of the order, it is impossible to tell what the state judge relied upon in making his decision.").[12] For each of these reasons, preclusive effect cannot be given to the *Hilton* court's choice-of-law determination, upon which was predicated the determination that the *Hilton* contract was unenforceable in Nevada.[13]

11. The four-page written order does not set forth a conclusion as to choice-of-law. The holding that Nevada law governed at least some facet of the dispute was, however, expressed in the oral ruling: "if you're going to do anything in this State, you have to comply with Nevada law. And if your contracts are going to have any effect in this state while they're here or while any party to them is here, they—you have to comply with Nevada law." The order and record submitted to this court do not reveal what, if anything, DKP or King (who was not served in the action) intended to do or had done in Nevada, nor indicate the court's findings as to the various parties' citizenship, domicile, place of contract negotiation or execution, or contemplated or actual place of performance under the agreements.

12. It would be inappropriate to assume, in litigation involving different parties, that the contacts relating to those different parties were in fact identical. Such an assumption, were it permissible, would likely be false in any event with respect to such matters as party citizenship, residence, and locus of contract negotiation and execution. To take a single example, a submission by Johnson and Douglas, who are citizens of Ohio, indicates that Hilton is a citizen of Canada. Obviously, this and other submissions by the parties to this court as to Hilton's contacts with New York, Nevada, or any other state (*see* Exhibit 13, appended to the Notice of Motion of Douglas and Johnson) cannot substitute for, or be permitted to supplement, the factual record that was before the Nevada state court at the time of the *Hilton* preliminary injunction ruling upon which preclusive effect is being urged.

13. The above discussion assumes the *Hilton* court actually made a choice-of-law determination, but that much is not even certain. Finding No. One of the *Hilton* court may represent simply the first of three distinct legal determination called for under Nevada choice-of-law rules. As set forth in the *Restatement (Second) of Conflicts of Law*, which is adhered to in Nevada: "When the validity of a contract is attacked on the ground of illegality, the forum will *first* decide whether illegality does in fact exist by reference to the appropriate law, which, as stated above, is usually the local law of the state where the act in question either has been, or is to be, done." Restatement (Second) of Conflict of Laws § 202 comment (c) (emphasis added) (1971). In the *Hilton* action for a declaratory judgment, the court apparently determined that the relevant act to be done was Hilton's scheduled fight in Nevada, and thus applied Nevada local law to determine illegality. Finding No. One sets forth that conclusion, *i.e.*, that the Agreements are illegal under the Nevada boxing regulations. Under the *Restatement (Second)*, that is the first legal determination required, but does not conclude the legal inquiry. As the *Restatement* explains, further, "If the answer to this inquiry is in the negative, that is the end of the matter. If, on the other hand, illegality is found to exist, the forum will look to the local contracts law of the state selected by the application of §§ 187–188 to determine the effect of this illegality upon the rights of the parties under the contract ... The law so selected will be applied to determine whether the contract is void or whether it can be avoided by one or by both of the parties." *Id.*

Thus, if application of the doctrine of issue preclusion was here appropriate, the parties here would be bound by the "step one" determination of the *Hilton* court, namely, that the Nevada Athletic Commission regulations prohibit actual contracts like the Promotional Agreement. The Nevada order, however, set forth no conclusion of law (or subsidiary findings of fact) as to the law it selected under Restatement (Second) § 187–188 (step two) to make the (step three) determination of "the effect of this illegality upon the rights of the parties under the contract." Restatement (Second) § 202 comment (c) at 646. This perhaps explains why the *Hilton* court also entered no conclusion of law as to the validity and enforceability of the contract (and hence the "rights of the parties under the contract") anywhere other than in Nevada. *See Hilton* Finding No. 3 and the discussion *infra* at 755–756. There may be some other reason, but under these indefinite circumstances, Johnson and Douglas have not

## B. *Finality of the Hilton Judgment*

█ The same result is independently compelled because the *Hilton* judgment was not a final judgment on the merits, as required by principles of collateral estoppel. *See City of Reno v. Nevada First Thrift,* 100 Nev. 483, 488, 686 P.2d 231, 234 (1984); *Bull v. McCuskey,* 96 Nev. 706, 710, 615 P.2d 957, 960 (1980); *Paul v. Pool,* 96 Nev. 130, 605 P.2d 635, 637 (1980). As noted, the *Hilton* suit was a declaratory judgment action in which plaintiffs also sought preliminary relief. The lawsuit was served on DKP on July 20, on July 27 a hearing was held at which plaintiffs' motion for a preliminary injunction was granted, and that order enjoined DKP from interfering with a bout involving Hilton that took place on July 29.

In entering the preliminary injunction, the *Hilton* court stated that it had considered "the probability of [Hilton] prevailing on the merits" and determined that "there's a likelihood of this Court determining that the exclusivity provisions in the King contract is prohibited in Nevada." Under Nevada law, like the Federal Rules of Civil Procedure, those tentative findings were an appropriate basis for determining the preliminary relief request since, as the Supreme Court has pointed out,

> [t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (citations omitted).

Findings made in a preliminary injunction proceeding therefore are seldom considered sufficiently final to be given preclusive effect. *See Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1350–51 (9th Cir.1982) ("issues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel") (relying on *Continental Baking Co. v. Katz,* 68 Cal.2d 512, 528, 67 Cal.Rptr. 761, 771, 439 P.2d 889, 899 (1968)); *Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 569 (8th Cir.1982) (granting or denial of preliminary injunction is not a final judgment for purposes of collateral estoppel); *Neuman v. Pike,* 456 F.Supp. 1192, 1205 (S.D.N.Y. 1978), *rev'd on other grounds,* 591 F.2d 191 (2d Cir.1979) (grant of preliminary relief "by its very nature ... is not a final judgment" and has "no *res judicata* or collateral estoppel effect" on subsequent action); *In re Super Premium Ice Cream Distribution Antitrust Litigation,* 691 F.Supp. 1262, 1269 (N.D.Cal.1988) (denying preclusive effect to preliminary injunction in antitrust action).

There are exceptions to the general rule, arising in circumstances where a ruling is rendered "practically" final owing to factors demonstrating "that it was not avowedly tentative [ ], the adequacy of the hearing, and the opportunity for review." *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir.1961), *cert. denied,* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). Thus, estoppel on occasion has been based upon preliminary injunction findings made after extensive hearing and briefing consolidated with trial on the merits, *see, e.g., Commodity Futures Trading Comm. v. Board of Trade,* 701 F.2d 653, 657–58 (7th Cir.1983) ("circumstances ma[d]e it likely that the findings are accurate [and] reliable" where con-

---

sustained their burden to "introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action." *Hernandez v. City of Los Angeles,* 624 F.2d 935, 937 (9th Cir.1980); *see also Russell v. Place,* 94 U.S. 606, 24 L.Ed. 214 (1877) ("an

estoppel must 'be certain to every intent;' and if upon the face of the record any thing is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it ..."), *cited in* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4420 at 188.

solidated six-day hearing had been held and the decision affirmed on appeal), or where it was fair to regard findings as practically final because the party seeking to avoid the preclusive effect of a preliminary injunction ruling, affirmed on appeal, had been the ones that chose the original litigation forum, instituted the preliminary relief application, and had, therefore, a full opportunity to present all crucial evidence and witnesses. *E.g., Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 992–996 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

Such conditions were not present in the *Hilton* action, and the parties cite no authority suggestive that Nevada law of issue preclusion deviates from the generally accepted view that preliminary injunction determinations are not entitled to preclusive effect. The facts of this case provide no temptation for testing that general view by giving the *Hilton* ruling preclusive effect.

The record is clear that the Nevada district court's findings were "avowedly tentative." The need to decide the issues with haste was inherent, given that the *Hilton* plaintiffs' filed their application for relief only ten days prior to the bout they had scheduled, and the hearing occurred only two days before it. Defendant DKP presented no witnesses or evidence at the hearing, objecting to the short notice upon which the hearing was held.[14] The court expressly declined to consolidate the emergency hearing with the trial on the merits, noting it was "not an appropriate [one] for advancement or consolidation" under Nevada's rules of civil procedure since that "would deprive [the parties] of any right to discovery."

Finally, lest any doubt remain that the findings of the *Hilton* court were sufficiently final for estoppel purposes, at the hearing the court stated on the record that "[n]o judgment will be a final judgment as a result of this proceeding." That pronouncement followed plaintiffs' counsel's assurances that "clearly we do not interpret this [order] nor could anybody who would read this Court's order ... interpret it as a final ruling on the merits. What it is and all we need at this time is to show the Court a probability of our success on the merits."

■ For these reasons, the *Hilton* court's preliminary injunction ruling cannot be regarded as "sufficiently firm" to warrant giving preclusive effect to its "avowedly tentative" findings. Further, were the *Hilton* ruling to be given preclusive effect, the order entered by its own terms does not address the validity or enforceability of the boxing contracts with exclusivity provisions *outside* of the State of Nevada, *see* Finding No. 3. The *Hilton* determination, if given effect here, therefore would not resolve anything since (a) it would not satisfy the condition of the Mirage–Douglas Contract requiring a final judgment from a court confirming that the contracts "are null, void and unenforceable to the extent they purport to grant to DKP the exclusive right to promote fights" of Douglas, nor would it (b) absolve Douglas from liability under the breach of contract claim, since the DKP agreements in question do not call for performance in Nevada, the only state in which the *Hilton* court declared similar agreements unenforceable. The Nevada state court judge made no findings as the validity of the contracts elsewhere, stating on the record his understanding, in response to counsel's colloquy in search of clarification, that the "contract is not enforceable in the State of Nevada."

For all these reasons, the *Hilton* preliminary injunction order does not have an issue-preclusive effect upon the issues raised in this proceeding. Accordingly, the choice-of-law issue must be examined afresh.

---

**14.** In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331 n. 15, 99 S.Ct. 645, 651 n. 15, 58 L.Ed.2d 552 (1979), the Supreme Court recognized that the application of offensive collateral estoppel may be unwarranted when "the defendant in the first action was forced to defend in an inconvenient forum and therefore was unable to engage in full scale discovery or call witnesses."

*Law Governing the Validity and Performance of the DKP/Johnson Contracts*

The Promotional Agreement states that "in all respects" it is to be "governed, construed and enforced in accordance with the laws of the State of New York applicable to contracts to be fully performed therein." To determine whether this contractual choice of governing law should be observed, the choice-of-law rules of New York are to be consulted, since in diversity actions such as this a court must apply the substantive law of the state in which it is located, including that state's choice-of-law rules. *Klaxon Co. v. Stentor,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975).[15]

"When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned...." *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir.1987) (citing *A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957) and Restatement (Second) of Conflict of Laws § 187 (1971)); *see also Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984); *Freedman v. Chemical Constr. Corp.,* 43 N.Y.2d 260, 265, 401 N.Y.S.2d 176, 179, 372 N.E.2d 12, 14 (1977). *Accord Superior Funding Corp. v. Big Apple Capital Corp.,* 738 F.Supp. 1468 (S.D.N.Y.1990) ("New York's choice of law rules will honor the parties' selection of the law that should govern the dispute when the law chosen has a reasonable relationship to the agreement and does not violate [New York] public policy"). Conflict with a strong countervailing public policy of New York aside, such provisions are properly disregarded only when the parties' chosen local law lacks such a substantial relationship and another state, application of whose local law is urged upon the court, demonstrably has "the most significant contacts with the matter in dispute...." *Walter E. Heller,* 730 F.2d at 52 (citing *Haag v. Barnes,* 9 N.Y.2d 554, 559, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961) and *Perrin v. Pearlstein,* 314 F.2d 863, 867 (2d Cir.1963)).[16]

Under this standard, the parties' choice of New York as governing law should be respected. The Promotional Agreement bears a reasonably substantial relationship to New York. New York is the state of residence of one of the contracting parties, DKP, serves as DKP's principal place of business, and is a state in which DKP has performed at least some of the promotional obligations called for by the Promotional Agreement. The contract was negotiated in several states, including

---

**15.** An exception to that rule applies when the action has been transferred from another forum, in which case the choice of law rules applicable in the transferor forum govern. *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). As noted above, *supra* at note 7, a further exception may exist when a court adopts as issue-preclusive the choice-of-law determination of a foreign jurisdiction in a dispute involving the same essential choice-of-law factual predicates.

**16.** The relevant provision of the *Restatement (Second) of Conflict of Laws,* which Nevada courts follow, *see Ferdie Sievers and Lake Tahoe Land Co. v. Diversified Mortgage Investors,* 95 Nev. 811, 603 P.2d 270, 273 (1979), provides essentially the same standards. It states as follows:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187. The rule of § 188 is that the law of the state that "has the most significant relationship to the transaction and parties" should govern, considering as particularly relevant to that determination the place of contracting, place of contract negotiation, place of performance, location of contract subject matter and the parties' domicile/residence. *Id.* § 188.

New York, Ohio, California and Nevada, apparently executed by King in New York, and then executed by Douglas and Johnson in Ohio.

Contrary to the position advanced by Douglas and Johnson, the State of Nevada has no greater relationship to the parties and the Promotional Agreement than does New York, and, in fact, appears to have a less substantial one. None of contract parties are citizens of that state (Johnson and Douglas are from Ohio), the parties did not contract to have Nevada law apply, the contract was not made there,[17] and does not call for performance there. Reliance on this last factor is particularly misplaced since the Promotional Agreement by its terms did not contemplate performance by Douglas and Johnson in any particular state (or country) and, in fact, fights pursu-

ant to the Agreement have been held (or were intended to be held) in wide-ranging locales (Tokyo, New Jersey, Las Vegas, and Edmonton). Under these circumstances and in a global industry such as boxing, reference to the locations of bout performances (or to the several states in which a promoter is licensed to promote boxing contests) provides no credible means for "centering" a dispute, and, therefore, no basis for undoing the parties' reasonable contractual choice of a local law.[18]

In short, the record does not establish that Nevada has the *most* significant relationship to the parties and the Promotional Agreement, nor that New York lacks a substantial or reasonable relationship to them. For these reasons, New York choice-of-law rules, much as the *Restate-*

---

**17.** A contract generally is considered " 'made' when the offer is accepted," *General Telephone Co. of the Southeast v. Trimm,* 706 F.2d 1117, 1119–20 (11th Cir.1983), which event did not occur in Nevada. "The acceptance, not delivery, constitutes the last act essential to the completion of the contract." *Id.* Nevada and New York law are in accord with that view. *See, e.g., SEC v. Elmas Trading Corp.,* 683 F.Supp. 743, 751 & n. 3 (D.Nev.1987) (last act making contract binding was acceptance by offeree, either over telephone or by signature of agreement), *aff'd,* 865 F.2d 265 (9th Cir.1988); *United States v. Bushwick Mills,* 165 F.2d 198, 202 (2d Cir. 1947) (contract entered into over telephone "is made in the district where the acceptance was spoken"); *Knight Products, Inc. v. Donnen–Fuel Co.,* 20 N.Y.S.2d 135, 139 (Sup.Ct.N.Y.Co.1940) (contract was made in Ohio where "final execution by plaintiff—the last act necessary to complete the contract—was performed in Ohio").

Here, under the Douglas/Johnson view that King's signature and handwritten modifications were not an acceptance but rather constituted a counter-offer, the contract would be made at the time Douglas and Johnson indicated their acceptance of the counter-offer by affixing their signatures to the counter-proposal, in Ohio. Thus, the fact that following their signing, the contract was mailed out to Nevada is of no contractual significance. Such delivery to King (in Nevada or anywhere) of a signed copy of the Agreement was made a condition of releasing from escrow the $25,000 check that was payable to Douglas *pursuant to* the Agreement. Such a condition does not suggest that delivery in Nevada was also made a condition to the making of the *contract* itself. Were that the case, however, it would be of little significance since "it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter

of acceptance is mailed in a railroad station in the course of an interstate trip." Restatement (Second) Conflict of Laws § 188 comment (e) at 580.

**18.** *See* Restatement (Second) § 188 comment e at 580 ("[T]he place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue.") *See also Foreman v. George Foreman Associates, Ltd.,* 517 F.2d 354 (9th Cir.1975). *Cf. MGM Grand Hotel, Inc. v. Imperial Glass Co.,* 65 F.R.D. 624, 631 (D.Nev.1974), *rev'd on other grounds,* 533 F.2d 486 (9th Cir.), *cert. denied,* 429 U.S. 887, 97 S.Ct. 239, 50 L.Ed.2d 168 (1976) (withholding application of California choice of law provision in contract, under Restatement §§ 187–188, where Nevada—the contractually-specified site of performance of hotel construction project which was subject matter of the contract and the place of business and incorporation of one party—had more significant contacts to the contract than California, the domicile of other party, the place of contract making and negotiation being unknown). Here, although Douglas has fought in Nevada numerous times pursuant to both the Promotional Agreement and prior agreements with DKP, performance in Nevada is not called for by the Agreement and Douglas and DKP, like most parties to boxing promotion contracts, contemplated and held bouts at a variety of sites. Fight locations at which DKP has promoted bouts include, in addition to Las Vegas, sites in New Jersey, California, Ohio, New York, Florida, and numerous locations overseas.

*ment (Second)* principles, require in this instance that the parties' chosen governing law be honored, and applied to resolve issues bearing on the validity, interpretation and enforceability of the Promotional Agreement. *See Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987) (upholding parties' choice of law clause as to substantive question of validity of contract where state of chosen local law was principal place of business of one of the contracting parties); Restatement (Second) of Conflict of Laws § 187 comment f (1988 supp.) ("When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when the state is that ... where one of the parties is domiciled or has his principal place of business."); *Foreman v. George Foreman Associates, Ltd.*, 517 F.2d 354, 356 (9th Cir.1975) (facts supported giving effect to contractual stipulation of California law in boxing contract where one of the parties was domiciled in state and executed contract there, and certain payments were to be made to account in California, notwithstanding that "it was certainly contemplated that Foreman would engage in boxing and related activities in other states or countries").

■ There remains the question of the law governing the Bout Agreement, which itself contains no choice-of-law provision. The Bout Agreement was entered into pursuant to the Promotion Agreement, suggesting that the parties, having failed to indicate to the contrary, intended New York as governing law. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 793 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (choice-of-law clause in first loan agreement applied to govern related, second loan agreement among same parties, absent indication of parties' contrary intent).

Even without that implicit contractual choice, a court applying the "grouping of contacts" or "significant relationship" approach used in New York, *see Interconti-*

*nental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 581 (1969); *American Home Assurance Co. v. Employers Mutual of Wausau*, 77 A.D.2d 421, 425, 434 N.Y.S.2d 7, 9 (1st Dept.1980) (citing *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954)), *aff'd*, 54 N.Y.2d 874, 444 N.Y.S.2d 917, 429 N.E.2d 424 (1981), and mirrored in the Restatement (Second) would be as unlikely to seize upon the law of Nevada as the appropriate governing law for the Bout Agreement as it would for the Promotional Agreement.

A decent case might be made for application of Ohio's local law. The Bout Agreement was negotiated there, was executed by Douglas and Johnson there, and Douglas and Johnson are citizens of that state, enhancing Ohio's governmental interest in the matter. Similarly, the fact that DKP and King are based in New York gives the State of New York an interest in DKP's contractual affairs. No such case exists for Nevada, which has no interest arising from the citizenship of the parties or their principal place of business, and no connection to the Bout Agreement's negotiation and execution. Contract performance points to Tokyo, where the Tyson–Douglas bout was fought, to New York where DKP made certain advance arrangements for that bout, or perhaps to New Jersey, the site at which the party to the contract given the authority to select bout locations—DKP—contemplates performance of the next bout optioned to it by Douglas and Johnson pursuant to the Bout Agreement.

Nevada's only connection to this contract is that the alleged breach of it occurred, if anywhere, within its boundaries. All parties concede that Douglas and Johnson came to Las Vegas and there negotiated a rival contract with Mirage providing for Douglas to fight there. No authority has been cited, however, for the proposition that the locus of breaching conduct (as distinguished from locus of performance) is determinative of (or even relevant to) the "grouping of contacts" equation undertaken in a contract action. There would appear to be sound public policy reasons for giving little or no weight to such a form

of contact in actions in which a mobile signatory challenges the validity of its contract. *Cf.* Restatement (Second) Conflict of Laws §§ 6, 188(2) (omitting place of contract breach from list of factors and contacts relevant to choice-of-law determination).

For all of these reasons, Nevada is not a preferred source of local law for the Bout Agreement under a "grouping of contacts" or "significant relationship" approach (and for much the same reasons, would not be under the Promotional Agreement, had the parties' there not indicated their determination to be governed by New York law). Such contacts as exist point principally to Ohio or New York, and no party urges that the law of the former jurisdiction (which presumably creates no conflict with New York law) be applied. Accordingly, New York choice-of-law rules, and the *Restatement (Second) of Conflict of Laws*, dictate that New York law govern resolution of issues arising under the Bout Agreement and the Promotion Agreement.

*The Nevada Exclusivity Rule*

■ Douglas and Johnson urge that this choice-of-law analysis fails to account adequately for the fundamental public policy of the State of Nevada expressed by Section 467.112(3) of the Nevada State Athletic Commission's Rules and Regulations, as recognized in the *Hilton* action. Under New York choice-of-law rules, however, as well as in the view of the *Restatement (Second) of Conflicts*, public policy concerns raised by application of foreign law become a relevant consideration only once it is demonstrated that the foreign forum would "be the state of the applicable law in the absence of an effective choice of law by the parties," by virtue of being the state with the "most significant relationship" to the transaction and the parties. Restate-

ment (Second) Conflict of Laws §§ 187(2)(b), 188(1); [19] *Bank Itec N.V. v. J. Henry Schroder Bank & Trust*, 612 F.Supp. 134, 141 (S.D.N.Y.1985); *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014, 1025 (S.D.N.Y.1984), *aff'd*, 762 F.2d 990 (2d Cir.1985). As already observed, Nevada lacks that relationship to the parties, to the Bout Agreement, and to the Promotion Agreement, which the parties reasonably chose would be governed by New York law.

The argument that this result allows parties too easily to evade the State's domestic regulation rests on a mistaken understanding of the subject matter of conflicts of law, underlying which is an effort by counsel for Douglas/Johnson to federalize Nevada's local boxing law, regardless of the contractual parties' connection to the state. That non-citizen, non-residents of a state such as Nevada should be able to enter into a contract containing terms enforceable under the laws of their respective states, and choose such laws (as opposed to the law of a foreign state such as Nevada) to govern their contract, provided such contract is to be performed in a state other than Nevada, is a commonly accepted and sought result in the field of conflicts of law—notwithstanding that a term of such a contract might be invalid under the law of Nevada or some other, non-related foreign state.[20] Professor Kramer has explained why (in the absence of express legislative intent) it is reasonable to limit the reach of a jurisdiction's laws in those instances where a state's contacts with a dispute are quite remote:

> [W]hile a state's laws may indeed reflect the judgment of the state's lawmakers about how best to organize society, each state presumably recognizes that other

19. As noted in the April 4 opinion, the *Restatement (Second)* also requires that the state with the competing law have a "materially greater interest than the chosen state in the determination of the particular issue...." Restatement (Second) Conflicts of Law § 187(1)(b). *See* April 4 Opinion, 735 F.Supp. at 536 n. 7.

20. *See, e.g.,* Leflar, *American Conflicts Law* § 91 at 268 (4th ed. 1986) (governmental "[i]nterests

have to be based on contacts"); Restatement (Second) § 188 comment c at 578 (non-domiciliary state has little interest in application of a rule designed to protect a party against the unfair use of superior bargaining power where performance of contract occurs in another state, nor much interest in application of a statute designed to regulate or to deter a certain business practice if conduct complained of is to take place outside the state).

states can have different views about what is best.... The presumption that a state's law does not reach cases with which the state has no contact ... avoids conflicts while increasing the utility of all states by facilitating each state's ability to regulate matters that are connected to that state.

Kramer, *Rethinking Choice of Law*, 90 Colum.L.Rev. 277, 294–95 (1990).

Principles of mutual accommodation and comity thus lead courts to "presume that a state's laws, even when written in language that is unqualified, should not apply in cases that are wholly domestic to another state." *Id.* at 294. To do otherwise would endanger interstate relations by encouraging local jurisdictions to assert extraterritorial control over the conduct of non-citizens. Granting such extraterritorial effect to local law would "abrogate rights of parties contracting beyond the state's jurisdiction, having little or no relation to anything done or to be done within Nevada," *Sievers v. Diversified Mortgage Investors*, 95 Nev. 811, 603 P.2d 270, 273–74 (1979). Such a result disserves interstate choice-of-law rules, "a crucial function" of which is to "further harmonious relations between states and facilitate commercial intercourse between them." *Id.*

Domestic regulation apparently is all that the Nevada legislature intended, however, when it defined the jurisdiction of the Nevada Athletic Commission as extending to "all contests or exhibitions of unarmed combat to be conducted, held or given *within* the State of Nevada...." Nev.Rev. Stat.Ann. § 467.070(1) (emphasis added); *accord* Op.Att'y General No. 352 (February 18, 1958) (Athletic Commission had no authority to require a local broadcaster of an out-of-state boxing match to obtain license from Commission nor could it collect tax on gate receipts of out-of-state match). The domestic domain of the Nevada Commission is in harmony with the scope given to the rules of the body regulating boxing in New York, *see Gregory v. Scorcia*, 493 F.Supp. 984 (S.D.N.Y.1980) (New York boxing regulations held inapplicable to prize fighting outside of the state); *Zwirn v. Galento*, 288 N.Y. 428, 43 N.E.2d 474 (1942) (athletic commission rules could not be given extraterritorial effect in order to vitiate boxing contract valid under laws of intended place of performance, although invalid in New York where it was executed), and presumably the athletic commissions of most other states.

The limited geographic scope of the athletic regulations does not imply (any more than does comity or conflicts law) that Nevada may not regulate domestic bouts that involve non-domiciliary fighters, managers and promoters. Obviously, if the Promotional Agreement or Bout Agreement called for performance in Nevada, or if DKP sought pursuant to the Promotional Agreement to compel a bout performance in Nevada, a distinct assessment of the relevant contacts and significance of the state's relationship to the dispute would be required, and that assessment would likely provide a substantially stronger basis for a finding that Nevada law governs. *See* Restatement (Second) Conflict of Laws § 188 comment e at 580 ("The state where performance is to occur has an obvious interest in the question whether this performance would be illegal"); *Id.* at § 202(2) ("When performance is illegal in the place of performance, the contract will usually be denied enforcement."); *Engel v. Ernst*, 102 Nev. 390, 724 P.2d 215, 217 (1986) (parties may not act "for the purpose of evading the law of the real situs of the contract.").

The instant case does not present that issue. Here the parties are neither citizens nor denizens of Nevada, the contracts were not made in Nevada and do not specify Nevada as a locus of performance, and, most significantly, the disputed fight under the Promotional and Bout Agreements is one that DKP, as promoter, seeks to enforce performance of in Atlantic City, New Jersey, not Nevada. As New York law is controlling on the facts of *this* case, the meaning and effect of the Nevada boxing regulations is not relevant to determination of the contractual issues here presented. Accordingly, it is not for this court to determine whether Nevada law would govern if DKP sought to enforce a bout agreement calling for Douglas to fight in Las Vegas.

*The Validity and Enforceability of the DKP/Johnson Contracts under New York Law*

For several reasons independent of the import of the regulations of the Nevada Athletic Commission, Johnson/Douglas contend that the Promotional Agreement and Bout Agreement do not bind them.

## A. Indefiniteness of Consideration

 According to Johnson and Douglas, the Promotion and Bout Agreements are unenforceable because they are indefinite as to the essential term of consideration. The facts are undisputed: the Promotion Agreement provided for payment of $25,000 to Douglas in return for his granting DKP the exclusive right to promote his bouts for a stated term. Compensation for the individual bouts that were contemplated by the Promotion Agreement (numbering no fewer than three per year, with the exception of the first contract year) was made subject to further negotiation and agreement, with the agreed-to terms to be set forth in the individually-negotiated bout agreements. The Promotion Agreement specified a floor level of compensation of $25,000, plus $10,000 in training expenses, for these fights, except that in the case of a title bout or defense of such a bout, no floor (or ceiling) was provided, the purse to be "negotiated and mutually agreed upon between us."

One such subsequent agreement as to Douglas' purse for a title fight was reached, as set forth in the Bout Agreement executed for the match with then-world champion Tyson. The Bout Agreement stated that "in full consideration of [Douglas'] participation in the [Tokyo] Bout and for all of the rights herein granted to Promoter," Douglas would be paid $1.3 million. That agreement further provided that with respect to Douglas' first three fights post-Tokyo, upon which DKP was given an exclusive option, the purse per fight would be $1 million, unless Douglas was the winner in Tokyo, in which case the amount would be subject to negotiation with that sum of $1 million as a floor.

In the face of this contractual language, Douglas and Johnson are forced to take the position that "although a minimum purse of $1,000,000 was specified, this is insufficient to render the contract sufficiently definite for enforcement" because "the 'minimum' consideration is obviously a token, at best." The factual predicate for the argument is that the market at present values the world champion heavyweight fighter at considerably more than one million dollars a pop (Johnson states he has received offers as high as $50 million for Douglas to fight, and King apparently offered him $15 million plus a percentage of gross receipts). Therefore, the contractually-specified million dollar compensation floor is asserted to be nothing other than the proverbial "peppercorn" of consideration.

Assuming the factual premise as to Douglas' present value, the argument, nevertheless, suffers once one considers that the appropriate yardstick for making the judgment. Whether one million dollars is token consideration must be assessed by reference to Douglas' expected future value as a fighter at the time the agreement was entered into, *i.e.,* before his unexpected defeat of Tyson. No one has contended on this record that $1 million was a "mere token" vis a vis Douglas' value at the time he, Johnson and their lawyer Enz, negotiated the Bout Agreement, and, in fact, the parties, after such negotiations, fixed a figure reasonably proximate to that —$1.3 million—for services to be rendered in a title fight with an undefeated heavyweight champion. Thus, when Douglas and Johnson signed the Bout Agreement they evidently did not regard one million dollars as a "peppercorn," even if they did not regard it as the full (as opposed to minimum) value to be affixed to Douglas' services when defending a championship. The subsequent change in Douglas' relative fortunes does not provide a legal basis now to disregard his prior agreement as to the reasonable floor at which to begin discussion of the value of his services as defending heavyweight champion.

It is standard contract law that a contract, to be binding, must address without "impenetrable vagueness" the terms material to its subject matter. *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981); *see also Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978). Just as well settled is the proposition that

> to render a contract enforceable, absolute certainty is not required; it is enough if the promise or agreement is sufficiently definite and explicit so that the intention of the parties may be ascertained 'to a reasonable certainty.' *Varney v. Ditmars,* 217 N.Y. 223, 228, 111 N.E. 822, 824, Ann.Cas.1916B, 758. A contract cannot be ignored as meaningless, except as a last resort. 'Indefiniteness must reach the point where construction becomes futile.' *Cohen & Sons v. M. Lurie Woolen Co.,* 232 N.Y. 112, 114, 133 N.E. 370, 371.

*Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693, 698 (S.D.N.Y.1976) (quoting *Castelli v. Tolibia,* 83 N.Y.S.2d 554 (Sup.Ct.1948), *aff'd,* 276 App.Div. 1066, 96 N.Y.S.2d 488 (1st Dep't 1950)), *aff'd,* 552 F.2d 447 (2d Cir.1977).

Here, the Promotional Agreement and Bout Agreement addressed their essential subject matter in a manner that is far from impenetrable. While leaving certain terms open to future negotiation, the contracts were explicit and definite about Douglas' commitment to fight only for DKP during the life of those contracts and about the minimum consideration he could receive for making that commitment. Thus, the contracts, at least with respect to their exclusivity terms, are much more than "mere agreements to agree." *Joseph Martin, Jr. Delicatessen,* 52 N.Y.2d at 109, 436 N.Y. S.2d at 249, 417 N.E.2d at 543.

The parties agreed to leave open the compensation that would be payable under certain contingencies, such as after Douglas' becoming world champion (in contrast to the fixed purse for title fights against another champion, which were priced at $1 million a bout) and this may have repercussions as to Douglas' obligation to fight a particular title defense at a particular price named by King, since no separate bout agreement has been executed for such fight pursuant to the process of negotiation contemplated by the Promotion Agreement for fights to be held under its provisions. Nevertheless, the writing manifests in definite language Douglas and DKP's agreement to deal exclusively with one another with respect to title defenses and to negotiate in an effort to reach a mutual understanding as to the open price term for such a defense.

For that reason, the exclusivity provisions of the Agreements are not void *ab initio* on grounds of price indefiniteness. *See R.S. Stokvis & Sons v. Kearney & Trecker Corp.,* 58 F.Supp. 260, 267 (S.D.N. Y.1944) (agreement containing definite grant of "exclusive representation" valid as to that term, notwithstanding that agreement contained "no provisions with respect to quantities, prices, deliveries, payments, or even discounts," all of which were "left 'to be arranged separately.'"). Whether $1 million turns out to be a definite default price—or merely a minimum price [21]—simply does not control the ques-

---

**21.** DKP believes that the Agreements actually require Douglas to fight any specific title defense for the sum of $1 million in the event the parties fail to reach an understanding as to appropriate compensation. Such a construction could be placed upon the Agreements but by no means was made explicit in them. The Bout Agreement states that "purse [is] to be negotiated but no less than ... one million" in the event of a title defense; the Promotion Agreement simply that "your purse for all subsequent title defenses shall be negotiated and mutually agreed upon between us." On the assumption that the language indicates a minimum but not a default price, enforceability of Douglas' obli-

gation to fight a specific bout absent agreement on the purse for such bout is unclear. *Cf. Foster v. Bullard,* 496 S.W.2d 724, 734 (Tex.Civ.App. 1973) (option to purchase at price consistent with competing offers and "not less than $750 per acre" sufficiently definite to be enforced); *Widmer v. Widmer,* 176 Pa.Super. 264, 106 A.2d 875, 876 (1954) (enforcing contract that facts reported show to contain a "not less than $500" price clause); *Trotter v. Lewis,* 185 Md. 528, 45 A.2d 329, 332–33 (1946) (option to purchase property for price "not to exceed $2,500" not indefinite); *Fruth v. Gaston,* 187 S.W.2d 581, 584 (Tex.Civ.App.1945) (agreement to pay em-

tion of whether Douglas and Johnson have violated the definite right they granted to DKP to exclusively "secure and arrange all [of Douglas'] professional boxing bouts" and their definite duty under the Agreement to refrain from "render[ing] [ ] services as a professional boxer to any person, firm or entity" other than DKP. That is because the minimum price terms, together with DKP's upfront payment of $25,000 and its commitments to hold a set number of bouts, clearly did provide an expectancy of compensation for Douglas that was sufficiently definite to induce his promise to fight exclusively for DKP. Accordingly, Douglas/Johnson fail to sustain their burden as movants seeking dismissal of the complaint on the ground that the underlying instruments are too illusory to be breached.

## B. Adequacy of the Term

 Douglas and Johnson next urge that this case in an appropriate one for application of the maxim that "an option actually intended by the parties to run for an unlimited time, i.e., forever is void." *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 424 P.2d 101 (1967); *see also Ketcham v. Hall Syndicate, Inc.*, 37 Misc.2d 693, 236 N.Y.S.2d 206, 212 (Sup.Ct.N.Y.Co.1962), *aff'd*, 19 A.D.2d 611, 242 N.Y.S.2d 182 (1963); *Jewish Center of Mt. Vernon v. Mt. Eden Cemetery Ass'n*, 30 Misc.2d 1057, 225 N.Y.S.2d 241 (Sup.Ct.Westch.Co.1960).

The Promotional Agreement and Bout Agreement do not fall into that class of contracts, as both contain clauses explicitly addressing duration and neither contemplates an indefinite term. The former provides that it shall run for three years and shall be "automatically extended to cover the entire period [Douglas is] world cham-

pion and a period of two years following the date on which [Douglas] thereafter cease[s], for any reason, to be so recognized as world champion." So extensive a commitment of one's services might be questioned as excessive, but clearly does not suffer from indefiniteness or ambiguity. Nor does the Bout Agreement: it grants DKP an exclusive option on the promotion of Douglas' "next three fights," which must be exercised within thirty days of the Tokyo bout.

Both are contracts "of the type … which do provide for termination or cancellation upon the occurrence of a specified event," *Payroll Express Corp. v. Aetna Casualty & Sur. Co.*, 659 F.2d 285, 291 (2d Cir.1981), and are therefore not jeopardized by the void-for-indefiniteness rule. *Id.* Contracts which "provide no fixed date for the termination of the promisor's obligation but condition the obligation upon an event which would necessarily terminate the contract" remain in force until that event occurs. *Warner–Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655 (S.D.N.Y.1959), *aff'd*, 280 F.2d 197 (2d Cir.1960) (upholding contract entered into in 1881 that lacked termination date but which obligated pharmaceutical manufacturer to pay royalties on every gross of "Listerine" made and sold by it as long as it continued to manufacture the product); *Ketcham v. Hall Syndicate, Inc.*, 37 Misc.2d 693, 236 N.Y.S.2d 206, 212–13 (Sup. Ct.1962) (agreement for syndication of cartoons sufficiently definite as to term where duration of contract was made subject to termination in event artist's share of revenue fell below stipulated amount), *aff'd*, 19 A.D.2d 611, 242 N.Y.S.2d 182 (1st Dep't 1963).[22]

---

ployee percentage of net profits of business not to exceed 5% and not less than 3% sufficiently definite because it "impl[ies] an agreement to pay at least the minimum amount designated," the court also noting that case did not require ordering employee to specifically perform duties) with *Chung v. Atwell*, 103 Nev. 482, 745 P.2d 370 (1987) (brokerage agreement held indefinite where it failed to address broker's fees or services to be performed by broker); *Von Reitzenstein v. Tomlinson*, 249 N.Y. 60, 162 N.E. 584 (1928) (promise to pay employee "appropri-

ate percentage" in excess of per diem salary found "too indefinite and meaningless to be enforceable"); *Varney v. Ditmars,* 217 N.Y. 223, 111 N.E. 822 (1916) (promise to pay plaintiff "fair share" of profits was too "vague, indefinite and uncertain.")

**22.** In general, contracts with terms that commit services for a commercial lifetime are not thereby invalid. *See Ehrenworth v. George F. Stuhmer & Co.,* 229 N.Y. 210, 220, 128 N.E. 108 (1920) (upholding validity of agreement to sell

Douglas claims the Bout Agreement option is nevertheless without significance because DKP failed to exercise its exclusive option by March 12, 1990, the thirtieth day following the Tokyo fight. The record shows that on March 8, 1990, DKP deposited with the postal service, by postage-paid certified mail, return receipt requested, a letter to Douglas at his home address in Ohio stating that DKP had elected to exercise its option under the Bout Agreement. Owing to the ineptitude of the Postal Service, that notice was not delivered then but instead was mistakenly returned to the sender (a fact which has been acknowledged by the Postal Service), until redelivered on March 30, 1990.

Technically, that notice nonetheless was effective, since the method of notification DKP followed was one of the two means specified in the Bout Agreement and under the Agreement, such notices are "deemed given when mailed or delivered to the telegraph office." If technicalities are to be put aside in favor of a more practical sense of notice-giving, that result can only favor DKP, since Johnson acknowledges that he met with King to discuss terms of a next-bout contract after the Tokyo fight, on or around February 14, and so had at least that much oral notice of King's desire to promote such a bout well before March 12, 1990. The institution of this lawsuit on February 22, 1990, may also, as a practical matter, have clued in Douglas and Johnson as to DKP's very concrete interest in promoting Douglas' next fight, pursuant to the Bout Agreement, but by that point notice may have become a "useless formality" since Douglas and Johnson had the day before sued to declare the Bout Agreement

void. *See O'Hare v. General Marine Transport Corp.*, 564 F.Supp. 1064, 1069 (S.D.N.Y.1983) (repudiation of contract renders non-repudiating party's observance of notice requirement futile).

*DKP's Alleged Breach of the Contracts*

Douglas and Johnson finally argue that DKP materially breached its obligations to them, thereby entitling them to treat the Agreements as void. DKP denies that its conduct in any way permits rescission of the Agreements.

A contract may be voided by breaching conduct that is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980) (quoting *Callanan v. Powers*, 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)); *see also Direction Associates, Inc. v. Programming and Sys., Inc.*, 412 F.Supp. 714, 719 (S.D.N.Y.1976) (rescission is appropriate only in instances of "breach going to the root of the contract"). The alleged breaches here are twofold: (1) DKP failed to promote the requisite four fights called for by the Promotional Agreement within the first year of that contract; and (2) DKP sought to undo Douglas' defeat of Tyson, in breach of its fiduciary duty and its duty of good faith and fair dealing.

**A. The Four Fight Requirement**

The first alleged breach—that DKP broke its promise to promote four fights in the first contract year—arises under paragraph three of the Promotion Agreement.[23] The undisputed facts are

---

bread to an exclusive distributor as long as both parties remained in business); *Zimco Restaurants, Inc. v. Bartender's & Culinary Workers Union*, 165 Cal.App.2d 235, 331 P.2d 789, 791 (1958) ("if the contract is to remain in effect so long as one continues to perform or act in a certain manner ... the agreement is sufficiently certain to be vital."). The parties have not briefed, and the court therefore does not address, whether in the context of a personal services contract such a term might be so "unduly harsh or one-sided" as to warrant withholding, as a matter of discretion, a restrictive negative covenant (perhaps in favor of some other remedy). *See Madison Square Garden Boxing, Inc. v.*

*Shavers*, 434 F.Supp. 449, 452 (S.D.N.Y.1977) (quoting *Connecticut Professional Sports Corp. v. Heyman*, 276 F.Supp. 618, 620 (S.D.N.Y.1967)).

**23.** That paragraph of the Promotional Agreement provides that DKP "shall promote not less than four (4) bouts requiring [Douglas'] services during the period from February 25, 1989 through February 25, 1990...." The subsequent Bout Agreement contains no such obligation. Thus, a breach by DKP of the four-fight requirement of the Promotional Agreement would not appear to alter any independent duties and rights of the parties that arise under the Bout Agreement, including any rights DKP

that Douglas fought in three fights during that contract year that were promoted by DKP, the last of which was the title challenge against Tyson; a bout agreement was executed by Douglas and DKP for another scheduled fight (which was to have followed the second fight and would have preceded the Tyson challenge); such bout was the "undercard" of a boxing program promoted by DKP which featured Tyson's defense of his title as the "main event"; and Tyson's illness led to DKP's cancellation of the entire program, including the bout involving Douglas.

The Promotional Agreement provides, with specific reference to DKP's bout-promoting obligations under paragraph three, that DKP "shall be deemed to have complied with its obligations with respect to any bout if it shall have made a 'bona fide offer' to promote a bout in accordance with the provisions, irrespective of whether such bout actually takes place for any reason other than DKP's non-performance." The scheduled fight against Lukasta constituted a bona fide offer within the meaning of paragraph three, since, as the paragraph requires, that bout had "a reasonable probability of occurring." However, for that bout to count as one of the four-contractually required fights, the fact that it did not occur must be for a reason "other than DKP's nonperformance."

In this case, that latter requirement was not satisfied, or at least satisfaction has not been demonstrated on the present record. Douglas states he stood ready to fight Lukasta for the $40,000 compensation agreed to in his bout agreement. That Tyson was sick cannot be assumed to have prevented DKP from going forward with the undercard (no more than would it have impeded DKP from paying Douglas the $40,000 purse he was to receive for the fight) since DKP had contracts with both of the healthy fighters on that card. Presumably, the absence of the main event did

has under the exclusive option contained therein.

**24.** Johnson explained at his deposition:
Our main goal was to fight for the heavyweight championship of the world. And our main goal was also to make as much money

render it unprofitable—not impossible—for DKP to do so. Thus, the reason the Lukasta bout (as opposed to the main event) did not "actually take place" was DKP's understandable "non-performance."

Accordingly, the planned but aborted Lukasta bout cannot count as one of the four fights DKP was obligated to promote under the Promotion Agreement, and DKP to that extent breached its obligations under the Promotional Agreement. However, the record establishes that Douglas and Johnson willfully waived enforcement of the requirement that DKP promote four fights and the conceivable opportunity for rescission it might have provided, by choosing instead to deal with DKP under the Promotional Agreement in anticipation of the fulfillment of other, more significant contractual benefits.

The cancelled Lukasta bout was to have occurred on November 18, 1989. Soon after then, DKP scheduled the championship bout between Douglas and Tyson to take place in February, 1990. Neither Johnson or his and Douglas' attorney, Enz, protested then that the Lukasta bout (for which DKP had paid them $10,000 in training expenses but not the $40,000 purse) did not count toward the mandated four bouts. Nor did they ask that another fight be scheduled in the interim or complain that by scheduling Douglas' crack at $1.3 million and Tyson for February, 1990, DKP was threatening breach of the Agreement because that timing would not permit Douglas a fourth (non-championship) bout prior to February 25, 1990 (the date concluding the first contract year).[24] What happened instead, not surprisingly, is that without a peep Douglas proceeded with preparations for the Tokyo bout—his long-awaited shot at the heavyweight championship for which opportunity he had contracted with DKP.

as we can.... My main goal [in negotiating the Promotional Agreement] was to get five fights. We got four. My main goal was to get the championship fight *sooner*....
Johnson Depo. at 88–89 (emphasis added).

Ordinarily, a party to a contract does not "waive[ ] his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other parties to perform thereunder." *S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.*, 307 F.2d 750 (2d Cir.1962); *see also Canda v. Wick*, 100 N.Y. 127, 2 N.E. 381 (1885). This dispute, however, falls outside the line of cases in which waiver does not attach because the party "attempts to encourage the breaching party to adhere to its [breached] obligations," and continues to desire performance of them, *Seven–Up Bottling Co. v. Pepsico, Inc.*, 686 F.Supp. 1015, 1023 (S.D.N.Y.1988). The conduct of Douglas and Johnson evinces that they did not prefer, did not encourage and did not urge, that DKP make good on a fourth fight rather than proceed with promotion of the heavyweight championship bout in February. Thus, assuming the cancellation of the Lukasta fight could in this context ever be considered a breach "going to the root of the contract" so as to warrant rescission (rather than a payment of $40,-000), *see Direction Associates, Inc.*, 412 F.Supp. at 719, the facts still compel the conclusion that Douglas and Johnson waived performance of the four-bout requirement, in favor of a higher object. *See generally Proteus Books Ltd. v. Cherry Lane Music Co.*, 688 F.Supp. 877, 882 (S.D. N.Y.1988) (party to contract may waive provisions made for its benefit), *aff'd in relevant part*, 873 F.2d 502 (2d Cir.1989).[25]

### B. Obligations to Deal Fairly and/or as a Fiduciary

More serious is the allegation that DKP breached duties owed to Douglas by virtue of King's ringside, and post-bout conduct, in Tokyo. At the end of the eighth round of the Douglas–Tyson fight, King concededly protested a "long count" given to Douglas after he was knocked down by Tyson, the reigning champion who was also under a promotional contract with DKP. The vigor and motivation with which King made his protest is disputed. For present purposes, the version submitted by a non-party witness, and advanced here by Douglas and Johnson, shall be assumed the truth.

According to this account, King became excited ("jubilant") when Tyson knocked Douglas down, yelling words to the effect that the "fight was over." He advanced to the nearby officials' table, where were seated representatives of two sanctioning bodies, the World Boxing Association and World Boxing Council. Douglas then got up from the count, causing King to say to the head of the World Boxing Council in loud and profane language, that the referee was "getting his man beat," that the "fight was over" and that it ought to be stopped.[26] King returned to his seat midway through the ninth round, the World Boxing Council official having taken no action to stop the fight nor having said anything to King. In the tenth round, Tyson was knocked out by Douglas, ending the fight.

One half-hour or so after the fight had concluded, King exited the arena with the official from the World Boxing Council, and was seen gesticulating wildly and yelling at him, as they entered a private area, that things had to be "straighten[ed] out." About two hours after the fight at a press conference, an attorney said to be speaking for certain of the governing bodies indicated that a portion of the fight had been reviewed, discussions had been had with

---

**25.** Although counsel for Douglas and Johnson contends the matter of waiver is not susceptible to summary resolution, since it depends upon an inference of the intent of the fighter and his manager to waive, *see Seven–Up Bottling Co. v. Pepsico, Inc.*, 686 F.Supp. 1015, 1023 (S.D.N.Y. 1988), counsel points to no fact bearing on the question that is genuinely disputed nor does he proffer affidavits of Johnson or Douglas stating (in contradiction of Johnson's and Enz's deposition testimony) that they ever sought and solicited DKP to schedule a fourth fight within the

contractual year, after learning that the Lukasta fight would not go through.

**26.** King maintains that he merely noted to the officials that there had been a rule incursion by the referee in failing to pick up the count properly, which he viewed as a promoter's duty to report. He states he sought to bring this to the attention of the officials so that the referee might be cautioned not to make the same "long count" mistake again, not to stop the fight.

the referee, and, as a result, the governing bodies would be deliberating as to the proper outcome of the fight. King then had played to the press a tape of the eighth round on TV monitors, stating that it would demonstrate "irrefutably" or "indubitably" that the first knockout cancelled the second knockout and that Tyson therefore was the champion.

The parties disagree whether this evidence establishes that DKP attempted to overturn Douglas' victory. DKP points out, without contradiction, that the referee has admitted, and the videotapes confirm, that King was correct in maintaining that Douglas received an overly long eighth round count. DKP insists King did little more than point the error out at the time it was made, and that others (a Tyson representative, as well as the Japanese Boxing Commission) acted independently when they protested the fight outcome officially after the bout. King never did lodge any formal challenge to Douglas' victory. However, that DKP did not formally challenge the victory does not mean that, in other ways, as by attempting to stop the fight after the eighth round and by conducting a press conference declaring Tyson still champion, King did not act to place a cloud over Douglas' claim to the title.

### i. *Covenant of Good Faith and Fair Dealing*

■ The legal question in the first instance then is whether, assuming such conduct occurred, it caused a breach of any legal (as distinct from ethical) duty owed by DKP to Douglas and Johnson. Under New York law, there exists in every contract an implied covenant of good faith and fair dealing. *See Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 412 N.Y. S.2d 827, 830, 385 N.E.2d 566, 569 (1978); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1517 (S.D.N.Y. 1989). The covenant is violated when a party to a contract acts in a manner that,

although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement. *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980), *cited in Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154, 1157 (S.D.N.Y.1988); *Hartford Fire Ins. Co. v. Federated Dept. Stores Inc.*, 723 F.Supp. 976, 990–991 (S.D. N.Y.1989).

■ In the context of agreements granting exclusive promotional or licensing rights, the promotor or exclusive licensee impliedly promises to "use reasonable efforts to generate profits" for the performer or licensor. *Mellencamp*, 698 F.Supp. at 1158 (citing *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, C.J.) (such promise, although not made in writing, arises from "instinct with an obligation"). The implied covenant does not, however, operate to create new contractual rights; it simply "ensures that parties to a contract perform the substantive, bargained-for terms of their agreement" and that parties are not unfairly denied "express, explicitly bargained-for benefits." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1516 n. 20, 1517. Nor does it ever "impose an obligation 'which would be inconsistent with other terms of the contractual relationship.'" *Id.* at 1517; *see also Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.*, 723 F.Supp. at 991.

■ A principle bargained-for contractual goal of Douglas' under the Promotion Agreement was that he obtain the opportunity to fight for (and hence, the opportunity to win) the heavyweight championship. Equally so, the Agreement provided that nothing contained within it "shall prevent DKP from engaging in promotion activities for any other professional boxer, including others in the same weight class as you."[27] By arranging the match-up with Tyson, DKP delivered on the most significant bar-

---

**27.** One of the reasons Douglas was encouraged by a rival promoter to renew his promotional dealings with DKP at the time the Promotional Agreement was under negotiation was that DKP represented a number of other heavyweight fighters, including, of course, the then-champion heavyweight, and so could best assure Douglas of a career that would include a shot at the title.

gained-for benefit Douglas had sought when entering into the Agreement. Moreover, in view of DKP's reservation of the right to promote the careers of other heavyweights, and King's well-known representation of Tyson, DKP cannot fairly be said to have had any obligation to *favor* Douglas' fighting interests over those of Tyson or other heavyweight fighters DKP promoted since that would be "an additional benefit for which [he] did not bargain." *Metropolitan Life Ins. Co.*, 716 F.Supp. at 1519.

Nevertheless, it seems doubtful that the covenant of good faith—even as informed by industry customs—permits a promoter, who has contracted to advance the fortunes of two fighters who compete in the same class, both of whom the promoter has under exclusive contract, actively to further one fight *outcome* over another in a title bout the promoter has arranged between them. That conclusion at least is suggested by the realization that the status and monetary rewards that accompany attaining a title are inseparable from the fighter's contracted-for benefit of attaining a title shot. It is the dream of obtaining all these benefits that draws a fighter to tie his career to one promoter exclusively. To hold it acceptable for such a promoter to lead a fighter to the ring, only to then act partially to influence the fight outcome against the same fighter's interest, does not appear to comport with the notion of fair dealing that inheres in every contract.[28] Such an act may have the direct "effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1385 (2d Cir.) (quoting *Kirke LaShelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). There can be little "doubt that such conduct strongly tend[s] to defeat the object of the parties in mak-

ing the contract." *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980).

That a less elevated standard of commercial dealing exists, or should be devised, for those who enter the boxing arena is not self-evident. Accordingly, subject to demonstration of a contrary prevailing industry standard, there appears to be no reason why the covenant of good faith and fair dealing should not be held to require that a promoter who represents rival fighters under exclusive contract not interfere in any respect with either fighter's quest inside the ring to obtain a decision in his favor from the fight's judges, nor with the process of recognition of that decision by the sanctioning bodies.

■ Applying that provisional standard to the asserted facts of King's conduct, DKP would appear to have breached its duty to Douglas by acting in other than an impartial manner (a) to stop a fight which Douglas had bargained for the opportunity to win without DKP's interference, and, thereafter, (b) to question the propriety of Douglas' apparent victory, contributing thereby to the cloud over his title and jeopardizing recognition of his victory by certain of the boxing governing bodies. As DKP disputes several of the facts contended by defendants Johnson and Douglas to have transpired, and credibility determinations may be necessary to resolve competing inferences as to party intent that arise from undisputed facts, the issue of whether DKP did actually and materially breach the implied duty of good faith and fair dealing must await determination at trial. There the parties also are invited to introduce evidence of prevailing industry practices or standards, if they believe it bears on the content of the implied covenant in the context of professional boxing promotion.

---

**28.** In such a circumstance, the promoter can faithfully adhere to the duties he owes to each fighter by a step as simple as restricting his promotional activities to arranging, rather than attempting to influence the outcome of, the sporting event. In the event a promoter chooses to step beyond the sphere of fight planning, preparation and scheduling and, instead, attempts to exert influence over the course of a fight once it is underway, the covenant of fair dealing appears to require that the conflict between the duties he owes to his performers be avoided by maintaining the strictest impartiality in any such influential action.

ii. *Fiduciary Duties of the Promoter*

In view of the above, the question of DKP's fiduciary duties as Johnson and Douglas assumes less salience. As Johnson and Douglas urge breach of those duties as well, it is nevertheless necessary to examine whether any such duties exist as a matter of law under the circumstances of this case. That determination, as it turns out, also will depend upon facts which will need be found at trial.

In *Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154 (S.D.N.Y.1988), this court examined at some length the conditions that under New York law may give rise to a fiduciary duty within the context of exclusive royalty contracts between author and publisher. The court's conclusion, based upon its review and sifting of the authorities, bears repeating:

> To the extent the cases discussed above intended to posit a per se rule that a publisher with exclusive rights in a work is a fiduciary for the author's interests, they must be rejected as inconsistent with *Van Valkenburgh [v. Hayden Pub. Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972), *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)]. The better view, and the one consistent with *Van Valkenburgh*, is that the "trust elements" in a publisher-author relationship come into play when the publisher tolerates infringing conduct, *Manning [v. Miller Music Corp.*, 174 F.Supp. 192, 195–96 (S.D.N.Y.1959)], *Cortner [v. Israel*, 732 F.2d 267 (2d Cir. 1984)], or participates in it, *Nelson v. Mills* [278 A.D. 311, 104 N.Y.S.2d 605 (1951), *aff'd*, 304 N.Y. 966, 110 N.E.2d 892 (1953) (holding that publisher's actual promotion of a song which infringed the author's was a "breach of contract of trust.")]. Ordinarily, however, the express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties. *See Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.); *Ekern v. Sew/Fit Company, Inc.*, 622 F.Supp. 367, 373 (N.D.Ill. 1985) (citing *Van Valkenburgh*). *Cf. Beneficial Commercial Corp. v. Mur-*

*ray Glick Datsun*, 601 F.Supp. 770, 772 (S.D.N.Y.1985) (absent assumption of control or responsibility and corresponding repose of trust, arm's length business transaction does not give rise to fiduciary relationship).

*Mellencamp*, 698 F.Supp. at 1159–1160.

To the extent the Douglas/Johnson fiduciary claim is predicated upon nothing more than the professional relationship existing between boxer and promoter defined by an exclusive promotional agreement, there appears to be no reason not to be guided by the general rule, followed in the publisher-author context, that such commercial arrangements ordinarily create no fiduciary duties, as opposed to a requirement of good faith performance. However, the present case involves two distinctive factual elements that, if established, may nevertheless implicate the duties of a fiduciary.

▮ The first was described in *Mellencamp* as conduct which implicates a "trust element" by virtue of the publishing party's active "participation" in conduct infringing the intellectual property of its author. In the instant case, it seems reasonable to regard as an implicating concern parallel to a publisher's disloyal participation in the infringement of a copyright, a promoter's active interference with or impairment of his fighter's being adjudged and recognized as the winner of a bout. Such conduct, if demonstrated, would appear to violate even the very limited tissue of trust a fighter reasonably reposes in a promoter with whom it has agreed to deal exclusively, under even the understood circumstance of that promoter's simultaneous representation of the interests of competing fighters.

▮ The second "trust element" that may come into play in this case derives, at least in theory, from specific conduct of DKP apart from the professional relationship defined by the "confidence reposed by one person in the integrity and fidelity of another," and which was subsequently betrayed. *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976), *appeal dismissed*, 42 N.Y.2d 908,

397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977), *quoted in Mellencamp v. Riva Music Ltd.,* 698 F.Supp. at 1156.

Counsel for Johnson and Douglas points to King's deposition testimony to establish a basis for such a relationship of trust and dependency. King described the relationship as follows:

> ... you find a fighter that nobody wants and that the fighter wants you to develop him, and he totally depends upon you, such as Mr. Douglas, and you carry him for a number of years....
>
> [H]ere you have a fighter that nobody wanted but me, and that I supported this fighter and carried him through the time of the crisis of being hungry, when I would feed him, and when it was cold I would clothe him. I would loan money to John Johnson, I loaned money to Buster Douglas....
>
> So you have these kind of agreements to help fighters, young fighters in their development and their growth, and you have to do it with a promotional agreement, otherwise you can't promote them or as a businessman, making a business decision to invest in a talent, you invest in a talent with the hopes of some day getting some redeeming value from the talent you have invested in.

> . . . . .

> I put every match that I had put on for Mr. Douglas, I had to pay for in its entirety, for the people that work for him ... and anything that Johnny [Johnson] would ask and say, "Give me an advance to hold me over and then you can take it out on a purse," ...
>
> But the point is not in how much. I was there when he needed me, the crises, when he called on me I was there.

If King's account is an accurate description of the history of his relationship with Douglas and Johnson, his conduct may have extended beyond the limits of his contractual obligations (which counsel for Douglas and Johnson have described, in another context, as involving nothing more than "to arrange for fights, and pay Douglas his purse"), and become almost paternal in nature and scope. Under New York law, that sort of relationship may provide the foundation from which the duties of a fiduciary arise, since such duties can attach to "those informal relations which exist whenever one man trusts in, and relies upon, another" as, for example, "in appropriate circumstances between close friends." *Penato*, 52 A.D.2d at 942, 383 N.Y.S.2d 900 (citations omitted).

The record evinces, however, that Douglas, or at least his manager Johnson—the parties who assertedly reposed their trust in King—saw the situation quite differently. Johnson indicated at his deposition that it was his perception that King *never* properly promoted Douglas, that he had witnessed King on several occasions express a lack of interest in and respect for the fighter and his prospects, and had perceived an abrupt change in King's position and enthusiasm only after the Tokyo bout, once it had become clear that Douglas' victory would stand.

It would be both unreasonable and unlikely for a person having those perceptions to repose an abiding trust in such an individual. Johnson's testimony reveals he did not. At best, Johnson indicates that he and Douglas "tried to like the man" but that King "makes it impossible. I am one of the only few people in the sport of boxing that has ever had anything halfway decent to say about Don King that I know of." As a matter of law, it can safely be said that being one of a handful of persons who have something "halfway decent" to say about an individual does not reflect the level of trust and confidence that must be reposed in another's integrity and fidelity to give rise to fiduciary duties. *See Penato v. George*, 52 A.D.2d at 942, 383 N.Y.S.2d 900; *Mobil Oil Corp. v. Rubenfeld*, 72 Misc.2d 392, 399–400, 339 N.Y.S.2d 623 (1972), *aff'd,* 77 Misc.2d 962, 357 N.Y.S.2d 589 (1974), *rev'd on other grounds,* 48 A.D.2d 428, 370 N.Y.S.2d 943 (1975), *aff'd,* 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976); *Cody v. Gallow,* 28 Misc.2d 373, 214 N.Y.S.2d 127 (1961).[29] As no more

---

**29.** Johnson's description of his contract negotiating sessions with King, his efforts to deal with

than that has been shown or proffered, this second theory of fiduciary duty is not viable.

\* \* \*

In view of the above, the cross-motions of DKP and Johnson/Douglas, each for summary judgment on the breach of contract claim, must be denied. Johnson/Douglas must be permitted the opportunity to prove at trial that DKP materially breached its duties of good faith dealing under the Agreement, or perhaps even fiduciary duties which it may have violated by actively and wilfully interfering in Douglas' ascension to the title. DKP must similarly be afforded the opportunity to establish that King did not endeavor or intend to interfere with Douglas' victory, or its recognition by the governing bodies, as King maintains, or, perhaps, that he acted consistently with expected and prevailing standards in professional boxing promotion.

The above appears at present to be the only issue for trial on the breach of contract claim since, that aside, it has been established that DKP is not collaterally estopped from seeking enforcement of the

Agreements, that the Agreements are not unlawful, void or illusory under the governing law of New York, and that Douglas and Johnson waived performance of the four-fight requirement under the Promotional Agreement. Accordingly, Douglas owes DKP a duty under the Agreements to fight in bouts arranged by it, or at least is obliged to sit down and attempt to negotiate in good faith reasonable terms for Douglas' next bout, unless it is shown at trial that DKP has materially breached its duties arising under the Agreements by seeking to prevent or interfere with Douglas' attainment of victory in the bout against Tyson.

II. *The GNI Motion for Summary Judgment on the Tortious Interference Claim*

 GNI has moved for summary judgment dismissing DKP's tortious interference claim. The elements of a claim for tortious interference with contractual relations are essentially the same under New York law and Nevada law.[30] The plaintiff must show that (i) it had a valid and binding agreement with another party; (ii) the alleged interferer knew of the agreement

other promoters in 1987, and his representation by legal counsel in such negotiations also do not comport with the image of passive dependency upon a fatherly promoter that counsel for Douglas and Johnson has sought to convey solely through reliance on King's deposition testimony.

30. It is therefore unnecessary to consider at length the parties' divergent contentions with respect to the law governing this cause of action. Both parties are perhaps correct in part, since a claim of tortious interference with contract appears to be the sort of "mixed" claim that might call for exercise of depecage, *i.e.,* application of separate law to distinct issues. *See, e.g., Babcock v. Johnson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (host-guest issue governed by New York law, while issue of defendant's negligence, under "rules of the road," would be governed by Ontario law). Under New York choice-of-law rules governing torts, "the place where tortious conduct occurred and where the injury was suffered, and the policies behind the substantive law of the respective jurisdiction" are relevant. *Bing v. Halstead,* 495 F.Supp. 517, 519 (S.D.N.Y.1980). Here, then, the elements of the cause of action most likely derive from Nevada law, as the claim sounds in tort, Nevada is the place where

the alleged tortious conduct occurred, where the tortfeasor is based, and where there is a governmental interest, presumably, in regulating interfering conduct occurring in the state. *See, generally Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (noting substantial interest place of tort has in application of its code of regulative, as opposed to loss-allocative, rules). Concededly, Nevada is not where the harmful effects of the tort would result. However, since one of the elements of this cause of action—under either Nevada or New York law—requires determining the validity of a contract as it existed between parties other than the alleged tortfeasor, there is reason to consider the contracting parties' own selection of New York law as the body of law governing the Agreements. For the reasons more fully elaborated *supra* at 756–758, under New York choice-of-law rules, New York law appropriately continues to govern determination of the contract validity issue, particularly since, as to that issue, it, not Nevada, is "the jurisdiction which has the greatest concern with, or interest in, the specific issue," *Neumeier v. Kuehner,* 31 N.Y.2d 121, 123, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972), in that the contract was one the parties chose to be construed under New York law, and by a party whose principal place of business is in this state.

yet acted intentionally to induce its breach; (iii) the agreement was consequently breached; and (iv) damage resulted from the breach. *See Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 4, 134 N.E.2d 97, 99 (1956); *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 501 N.Y.S.2d 871, 873 (1st Dep't 1986); *Universal City Studios v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir.1986); *Hartford Fire Ins. Co. v. Federated Department Stores*, 723 F.Supp. 976, 995 (S.D.N.Y.1989); *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574, 579 (D.Nev.1984) (citing *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1019 (9th Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983)).

### The Requirement of Breach

For reasons addressed at some length above, whether DKP has a binding contract with Douglas and Johnson is a question that must await trial. That defense aside, Mirage posits several other reasons why, even if the Promotion and Bout Agreements turn out to be valid and binding, that it did not tortiously interfere with those Agreements. The first is that there has been no breach of them. To support that contention Mirage observes that performance of its contract with Douglas (the "Mirage–Douglas Contract") is explicitly made conditional upon a prior judicial declaration that the Promotion and Bout Agreements are null, void, and unenforceable.[31] Should that assumption prove incorrect after trial, Mirage will have no rights or obligations with respect to Douglas' services and

Douglas will remain bound to DKP. Therefore, the argument goes, there can be no underlying breach and no tortious interference.

Crafty lawyering thus presents for decision here the question whether the inclusion in a contract of a term that conditions contractual performance upon obtaining what is in essence advance judicial clearance for a contemplated, potentially interfering course of conduct forecloses finding the signatory liable for improperly and intentionally inducing a breach of another's contract. Although contract conditionality well may have that immunizing effect in some case, the present one does not appear to be a proper candidate.

Were the sole basis for DKP's claim of breach against Douglas and Johnson their failure to abide that portion of the Promotion Agreement that forbids Douglas from participation in boxing matches other than those promoted by DKP, liability against Mirage on the tortious interference claim would be foreclosed. No such match has yet transpired, and, under the terms of the Mirage–Douglas Contract, none shall if the Agreements are found by a court to be binding and enforceable. However, the issue is muddied here because the Promotion Agreement contains other clauses that DKP relies upon to demonstrate breach. For instance, the Agreement provides that DKP has the right to "secure and arrange all bouts" involving Douglas, contemplates that DKP designate the dates, sites and opponents for such bouts after consultation with Douglas, and in the event Douglas is "recognized by the IBF, WBC or WBA as a

---

**31.** The Mirage–Douglas Contract provision in question reads as follows:

> 8. *Conditions*
> This agreement is entered into by the Mirage on the assumption (the "Assumption") that the contracts dated December 31, 1988 [the Promotional Agreement] and August 14, 1989 [the Bout Agreement] between and among Don King Productions, Inc. ("DKP"), Champion [Douglas] and Manager [Johnson] are null, void and unenforceable to the extent they purport to grant to DKP the exclusive right to promote fights of the Champion and/or require Champion to fight exclusively for DKP. Consequently, the rights and obligations of the Mirage are contingent upon the obtaining by Champion and/or Manager on or before September 1, 1990, of either or both of (a) a written release or waiver by DKP of its purported exclusive promotional rights under the aforesaid contracts and/or (b) a final judgment from a Nevada state court or federal court of the United States confirming the validity of the Assumption. Champion, Manager and Mirage agree to commence and prosecute, as expeditiously as possible, a lawsuit seeking such relief. In the event that either of the foregoing conditions is not satisfied on or before September 1, 1990 this agreement shall, at Mirage's option, be null and void and of no effect, without any liability on the part of any party.

world champion," provides that the "purse for all subsequent title defenses shall be negotiated and mutually agreed upon" between Douglas and DKP.

Significantly, the Agreement also contains the following warranty and representation by Douglas:

> [Douglas] will not hereafter enter into any contract, agreement or understanding, whether oral or written, which conflicts in any material respect with the provisions hereof or which purports to grant similar or conflicting rights to any person, firm or entity other than DKP, or which would or might interfere with your full and complete performance hereunder or the free and unimpaired exercise by DKP of any of the rights granted to DKP under this Agreement.

The existence within the Mirage–Douglas Contract of a contingency clause does not make it any less a "contract, agreement or understanding" under the law; it simply reflects that its performance and term have been made to depend upon the occurrence of a conditional event. *See Office of Comptroller General of Republic of Bolivia v. International Promotions & Ventures, Ltd.,* 618 F.Supp. 202, 207 (S.D.N.Y. 1985); *Axelrath v. Spencer Kellogg & Sons,* 33 N.Y.S.2d 94, 95–96 (Sup.Ct. Kings Co.), *aff'd,* 265 A.D. 874, 38 N.Y.S.2d 39 (1942), *aff'd,* 290 N.Y. 767, 50 N.E.2d 103, *cert. denied,* 320 U.S. 761, 64 S.Ct. 71, 88 L.Ed. 454 (1943). The latter characteristic of the contingency clause does, however, foreclose a judicial finding that the Mirage–Douglas Contract presently "conflicts" with the provisions of the Promotion

Agreement or "purports to grant similar or conflicting rights" because that contract purports to grant *no* rights whatsoever to the Mirage (nor impose any obligations upon it) unless and until the contractual condition—obtaining a release from DKP or a judgment from a court extinguishing or declaring void DKP's exclusive promotional rights—is fulfilled. This follows from the unexceptionable principle of contract law that nonperformance or nonoccurrence of a contractual condition may prevent rights and obligations from arising, or even annul or invalidate an agreement. Restatement of Contracts (Second) §§ 224–225 (1979); 3A *Corbin on Contracts* §§ 626–28 (1960); *Office of Comptroller General of Republic of Bolivia,* 618 F.Supp. at 207.[32]

The Mirage–Douglas Contract *itself* therefore does not appear to constitute a breach by Douglas of his Agreements with DKP, since its terms do not call upon Douglas to perform professional services as a boxer until DKP's exclusive right to such services have been terminated—whether by release or court ruling. *Cf., Cincinnati Bengals, Inc. v. Bergey,* 453 F.Supp. 129 (S.D.Ohio 1974) ("It is not illegal for either the player or the sports organization, at the time when the player is under a valid contract to one team to ... enter into a contract with a different, competing, team ... under the terms of which the player agrees to render his services at the expiration of his current contract.").

However, DKP does not limit its proffer on the subject of breach to the Contract alone. It argues that Douglas'

---

32. Such contingencies may render the rights, interests of or injuries to a party to such a contract too speculative to "justify exercise of the court's remedial powers on his behalf," *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), a finding that, as to Mirage's interest in the Mirage–Douglas Contract, has been made for standing purposes in the concurrent Nevada federal court action between the parties. *Douglas, Johnson, and The Mirage Casino–Hotel v. Don King Productions, Inc.,* 736 F.Supp. 223 (D.Nev.1990) (order dismissing as unripe and improvident the claims of Mirage for declaratory relief that its contract with Douglas is neither unlawful nor an instrument which tortiously interferes with DKP's

agreements). DKP's success in arguing that Mirage lacks standing to obtain declaratory relief because the hotel's contractual rights to Douglas' services are necessarily unripe and speculative does not, as Mirage contends, estop DKP from advancing the analytically distinct proposition that the Mirage has, by its conduct, tortiously interfered with DKP's own assertedly ripe and robust contractual rights. That simply is not a "contrary position" warranting application of the doctrine of judicial estoppel under the cases cited by Mirage. *See, e.g., Yonkers v. Otis Elevator Co.,* 607 F.Supp. 1416 (S.D.N.Y. 1985), *aff'd,* 844 F.2d 42 (2d Cir.1988); *Tepper Realty Company v. Mosaic Tile Company,* 259 F.Supp. 688, 692 (S.D.N.Y.1966).

breach arises equally from his abrupt termination of negotiations with DKP respecting the proposed Douglas/Tyson rematch that DKP had sought to hold at a DKP-designated site (Atlantic City) and time (June 18, 1990), and his refusal since then to resume negotiations with DKP or otherwise agree to participate in a DKP-arranged bout, as he assertedly is required by contract to do. Douglas' conduct in this respect is, for purposes of these motions, undisputed. As the contingency clause cannot "undo" these acts, summary judgment cannot be granted Mirage on the basis of the "breach" element of a tortious interference claim.

*Inducement of Breach*

▮▮▮▮▮ Mirage next questions that it had any role in inducing Douglas' breaching conduct. A genuine dispute exists as to that issue foreclosing summary judgment for Mirage. In a tortious interference action, the plaintiff must show that tortfeasor's actions were the proximate cause of the breach of contract. *See Spe-*

*cial Event Entertainment v. Rockefeller Center Inc.,* 458 F.Supp. 72, 78 (S.D.N.Y. 1978); *Hill v. Progress Co.,* 79 Cal.App.2d 771, 780, 180 P.2d 956 (1947). DKP points to circumstantial evidence suggestive that Douglas' termination of negotiations with DKP resulted from Mirage's entreaties, and that his subsequent (and continuing) unwillingness to fight for DKP (as opposed to Mirage) has been induced by Mirage's offer of $25 million to him for each of the two fights it proposes to stage at its casino/hotel in Las Vegas.[33]

According to Mirage, its conduct could not have had such asserted effects upon Douglas and Johnson because prior to any dealings the Mirage had with them, the fighter and manager already had decided that they were no longer bound by their Agreements with DKP. Whether they were resolved to *act* other than in conformance with the requirements of those Agreements prior to meeting with Mirage officials is a disputed question of fact, however, as the record contains evidence both supportive and contradictive of that view.[34]

---

**33.** That the final Mirage–Douglas Contract by its terms does not evince a breach of the Agreements does not warrant concluding as a matter of law on this motion that the acts and conduct that led up to that Contract's making did not induce Douglas and Johnson to breach the Agreements, nor that, the Contract's conditionality notwithstanding, the anticipated and actual effect of the Contract upon Douglas and Johnson was to induce breach of those Agreements. Acts and talk that induce breachful conduct (such as a refusal to negotiate with or participate in bouts sponsored by one's promoter) may be tortious even when they do not lead to (or are not even aimed at producing) a competing contract. *See, e.g., Universal City Studios, Inc. v. Nintendo Co.,* 615 F.Supp. 838 (S.D.N.Y. 1985) (threats and suits inducing third parties to breach licensing agreements with competitor held tortious). The fact that such acts and talk *do* culminate in a signed contract obviously cannot as a matter of law eviscerate relevant procuring or inducive conduct that preceded the execution of the contract, just as the inducive effect the terms of a signed contract have upon a player remains factually relevant to a tortious interference claim. *See, e.g., Munchak Corp. v. Cunningham,* 457 F.2d 721, 724 (4th Cir.1972) (considering whether effect of conditional term of compensation in competing agreement was to create incentive for player to withhold his personal services during option year rather than perform his existing contract), *explained in Cin-*

*cinnati Bengals, Inc. v. Bergey,* 453 F.Supp. 129, 142–44 (S.D.Ohio 1974).

Moreover, here the record does not establish (nor does Mirage contend in its Statement Pursuant to Rule 3(g) of the Local Rules of the Southern and Eastern District) that Mirage's entreaties, representations or offers to Douglas, *ab initio,* were enfolded in the language of conditionality that was set forth in the final Contract executed on February 21, 1990. Thus, for example, it may be that when $25 million was first discussed as a payment to Douglas, the payment was clearly made contingent upon obtaining a prior declaration of the invalidity of DKP's contracts—but it may not have been. If the express conditionality came only later, yet the price range of the offer had an intended or foreseeable effect of closing Douglas' ears to continued negotiations and dealings with DKP under the existing Agreements, that might establish the inducement element of the claim in question.

**34.** For instance, Johnson stated at deposition that he decided in Tokyo that King had no ties on Douglas after "he filed the protest and stuff." It is conceded that Johnson did meet with King in New York on February 14 to discuss the terms of a rematch with Tyson. He stated at deposition that he did not regard those discussions as pursuant to the Agreements and told King as much. According to others, that same day Johnson stated he had a contract with King and indicated he expected that he and King would work things out.

In view of the circumstantial evidence suggesting that Mirage's conduct influenced Douglas' and Johnson's conduct, and this conflicting testimony, summary judgment cannot be granted to The Mirage on grounds of lack of breach or of Mirage's lack of proximate connection to the breach.

*Knowledge of the Contracts*

To establish a claim of tortious interference with contract, a plaintiff must demonstrate the "defendant's knowledge of that contract." *Israel v. Wood Dolson Co.*, 1 N.Y.2d at 120, 151 N.Y.S.2d at 5, 134 N.E.2d at 99; *Hornstein v. Podwitz*, 254 N.Y. 443, 173 N.E. 674 (1930); *S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 108 A.D.2d 351, 354, 489 N.Y.S.2d 478, 480 (1st Dep't 1985); *Woods v. Reno Commodities, Inc.*, 600 F.Supp. at 579. Mirage does not dispute that DKP's counsel on February 16, 1990 sent it a letter advising it of the existence of the Agreements nor that it reviewed copies of the actual Agreements in connection with its discussions with Douglas and Johnson.

Relying on *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y.1971), Mirage argues that summary judgment is appropriate anyway because at the time of its actions it lacked (and still lacks) affirmative knowledge that the Agreements are valid and binding upon Douglas and Johnson. Mirage's argument miscasts the legal standard and misreads the cases.

■ In a tortious interference action, a plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue. *Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) (alleged tortfeasor only must know "that his competitor had a contract with the third party" since "as a practical matter he will usually be totally unaware of ... the legal particulars of that contract"). It is enough that the defendant who interfered have "[k]nowledge of the *existence* of the contract," which itself may suffice to imply malice. *American Cyanamid*, 331 F.Supp. at 608 (emphasis added)

(also quoting *Lamb v. S. Cheney & Son*, 227 N.Y. 418, 422, 125 N.E. 817, 818 (1920) for the proposition that the "gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof").

The *Restatement (Second) of Torts* commentary explains the standard as follows:

*Actor's knowledge of other's contract.* To be subject to liability ... the actor must have knowledge of the contract with which he is interfering.... [I]t is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty ... If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding....

Restatement (Second) of Torts § 766 comment i (1979).

■ *American Cyanamid* (decided before the New York Court of Appeals decision in *Guard–Life* and without reference to the Restatement commentary), provided a bit more room for a mistaken defendant who acted as might "[a] reasonably prudent person" in thinking an agreement had not yet become final. 331 F.Supp. at 608. Noting that the defendant there had before it only a "letter [that] on its face would not appear to be binding" and no other knowledge of the parties' agreements, the *American Cyanamid* court fairly reasoned that "where actual knowledge of the existence of a contract cannot be reasonably attributed to the alleged tortfeasor" a claim of tortious interference could not lie since "[o]ne must know that there is a contract before he can be found to have intended to do an unlawful act by inducing its breach." *Id.*

Detecting a slight chink in the Restatement armor, the Mirage would have it that a party sued for tortious interference with a contract is shielded from liability by establishing that it lacked definite knowledge that the contract was valid—such as when, after investigation and inquiry by legal counsel, the competitor discovers that reasonable arguments could be made, and gen-

uinely believed, that its competitor's contract might be declared unenforceable. That is not the standard of *American Cyanamid;* if it were, disavowal of this self-reflexively tentative "prediction of New York law" as mistaken would be required, *id.* at 609, at risk otherwise of nullifying the tort of tortious interference in contradiction to the established intent of the New York Court of Appeals.

*American Cyanamid's* reasoning is simply that a defendant, "newly arrived on the scene," cannot be liable when it lacks reason even to believe there has yet come into formation any firm contract between parties who are still negotiating, based upon the defendant's facial examination of the only document to which it has access. *Id.*[35] Mirage's position does not fit the bill. Upon reviewing the four corners of the DKP–Johnson Promotion Agreement, it had affirmative knowledge of the existence of a firm contract, had every reason to believe that Douglas was contractually committed to fight for DKP, and in fact, according to affidavit of its general counsel, did so believe after such review. Thus, "actual knowledge of the existence of the contract" can fairly be attributed to Mirage, which is all the knowledge that the tort requires be established. *American Cyanamid,* 331 F.Supp. at 608. *Accord Guard–Life Corp.,* 50 N.Y.2d at 193, 428 N.Y.S.2d at 634, 406 N.E.2d at 450; *Israel v. Wood Dolson Co.,* 1 N.Y.2d at 120, 151 N.Y.S.2d at 5, 134 N.E.2d at 99.

*Improper Interference*

■ It is a separate matter whether Mirage acted improperly in interfering with performance of the Agreements of which it had actual knowledge. "Malice, in the sense of intending actual harm because of spite or ill feeling is, of course, not a requisite to the tort...." *American Cyanamid,* 331 F.Supp. at 608 (citation omitted). The intentional commission of acts that improperly interfere with the performance of another's contract is. *Guard–Life Corp.,*

50 N.Y.2d at 189, 428 N.Y.S.2d at 631, 406 N.E.2d at 447; *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671, 676 (2d Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984); Restatement (Second) of Torts § 766–67 (1977); *see also Woods v. Reno Commodities, Inc.,* 600 F.Supp. at 579 (intent to induce breach); *Hill v. Progress Co.,* 79 Cal.App.2d 771, 780, 180 P.2d 956 (1947) (requiring breach by reason of defendant's "wrongful act"). According to Mirage, its conduct is free of such impropriety.

The principal basis for this contention of Mirage has previously been addressed, *viz.,* that the Mirage–Douglas Contract contains the condition precedent. Here it adds that the condition was specifically insisted upon by Mirage, for the purpose of ensuring that no breach of the Agreements would or could occur. As already observed, *supra,* assuming that the execution of the Contract itself does not breach the Agreements owing to its contingency clause, Mirage does not conclusively establish thereby that its acts in entreating Douglas and Johnson to Las Vegas and, once there, holding strategy and negotiating sessions with them prefatory to the final Contract, were innocent in the sense that they fairly could be said to have no foreseeable tendency to induce breach.

The point is not controlled by what Mirage *felt* about the validity of DKP's Agreements, but by what it actively did with reference to them. It is true that "'no actionable wrong is committed by a competitor who solicits his competitor's employees ... who are not under contract, so long as the inducement to leave is not accompanied by unlawful action.'" *Diodes, Inc. v. Franzen,* 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 26 (1968). *See also Triangle Film Corp. v. Artcraft Pictures Corp.,* 250 F. 981, 982 (2d Cir.1918) ("every one has ... the right to offer better terms to another's employe, so long as the latter

---

**35.** The signed document the defendant there read stated in its concluding paragraph that "consummation of the planned acquisition is conditioned upon the execution of a mutually satisfactory purchase agreement and, on the part of Cyanamid, the approval of its board of directors. It is understood that if, either Cyanamid or Elizabeth Arden is unable to reach such agreement or to obtain such approval, neither party shall have any obligation to the other."

is free to leave.") (Learned Hand, J.). Douglas was under contract, however, and was known to be by Mirage.

It is this "actual, legal interest" and not "the state of mind of the interfering tortfeasor" that determines the propriety of interference. *Guard–Life Corp.*, 50 N.Y.2d at 193, 428 N.Y.S.2d at 634, 406 N.E.2d at 450; *see also Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 446 (S.D.N.Y.1988). That Mirage believed the Agreements might be invalid and that in its Contract with Douglas and Johnson Mirage carefully made its rights contingent upon such a determination, are facts which do not therefore automatically serve to insulate it from liability. Obviously, if its belief is correct there can be no liability, since the existence of a valid contract is a requisite element of the tort. *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574, 579 (D.Nev.1984). However, should it prove to pass that Mirage's dealings with Douglas and Johnson foreseeably caused interference with DKP's enjoyment of known contractual rights, and those rights turn out to be valid and enforceable, Mirage's mistaken or wishful belief that they were not would not appear, under the teaching of *Guard–Life Corp., supra,* to save it from answering for any breaching conduct its acts of intentional interference brought on.

Applying that standard, summary judgment is inappropriate. It is undisputed that Mirage entreated Douglas and Johnson to come to Las Vegas to explore possible business terms, and, once there, offered them monetarily rewarding terms the purpose of which necessarily included interesting Douglas in the prospect of fighting in Las Vegas in a bout or bouts which Mirage sought to promote. In view of Mirage's knowledge of Douglas' existing Agreement providing that Douglas deal exclusively with King, an inference of an interfering intent arises from those facts, since "persuasion to breach alone, as by an offer of better terms" may demonstrate improper interference with a contract of definite term (as opposed to one terminable at will). *Guard–Life Corp.*, 50 N.Y.2d at 194, 428 N.Y.S.2d at 634, 406 N.E.2d at 450. *Ac-*

*cord American Cyanamid,* 331 F.Supp. at 608 ("offer of higher price would be relevant, indeed, to a finding of legal malice ... [were there] the knowledge of an obligation already existing"); *Gold Medal Farms v. Rutland County Co-op. Creamery, Inc.,* 9 A.D.2d 473, 195 N.Y.S.2d 179 (3d Dept.1959) (element satisfied by making "an offer of better terms to [the party] with the intent of persuading it to breach its contract"). *See also Cincinnati Bengals v. Bergey,* 453 F.Supp. 129, 142–44 (discussing cases in which no intent to interfere was found on part of competing team, notwithstanding that contract with rival team was negotiated and executed while player remained under contract with home team, because rival contract required player's performance to begin only after expiration of existing contractual term and financial terms of rival contract created no incentive for player to breach any existing contractual obligations).

For the above reasons, Mirage's motion for summary judgment dismissing the tortious interference claim must be denied. The damage issues Mirage has raised with respect to the claim are reserved for determination at trial.

### III. *The DKP Motion to Dismiss Mirage's Counterclaim*

No opposition having been presented to DKP's motion to dismiss Mirage's counterclaim, that claim shall be dismissed. Although the parties have not addressed the issue, that resolution would appear warranted by the ruling of the Honorable Howard D. McKibben in *Douglas v. Donald King Productions, Inc.,* 736 F.Supp. 223 (D.Nev.1990), dismissing the identical claim asserted in that action.

### *Conclusion*

In accordance with the discussion above, the motion of DKP to dismiss the counterclaim of Mirage is granted. The motions of DKP, Douglas and Johnson, and Mirage for summary judgment granting or dismissing the respective claims are denied.

It is so ordered.